**TRUCKS, INC., et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. Nos. 81–0–70 through 81–0–80.**

United States District Court, D. Nebraska.

April 3, 1984.

---

John E. North, Jeffrey J. Pirruccello, Omaha, Neb., for plaintiffs.

Daniel F. Ross, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

These eleven consolidated income tax refund actions (CV. Nos. 81–0–70 to 81–0–80 inclusive)[1] came on for trial before the Court without a jury on December 5–7, 1983. Plaintiffs[2] seek a refund of certain income taxes and interest paid by them for the years 1975 and 1976. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422. This memorandum opinion will constitute the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). Having carefully considered the pleadings, the testimony, the exhibits, stipulations, arguments, and briefs, and being fully advised in the premises, the Court hereby concludes that judgment should be entered for the plaintiffs in all respects in cases CV. Nos. 81–0–70; 81–0–71; 81–0–72; 81–0–73; and 81–0–74, and that, therefore, cases CV. Nos. 81–0–75; 81–0–76; 81–0–77; 81–0–78; 81–0–79 and 81–0–80 should be dismissed for the reasons hereinafter stated.

## FINDINGS OF FACT

Members of the Leroy Hilt family and a family-owned corporation instituted these income tax refund suits as civil actions for the recovery of the 1975 and 1976 corporate and individual Internal Revenue taxes paid by them and claimed to have been wrongfully assessed and collected by the defendant United States. Both the corporate and individual taxpayers in this litigation filed their federal income tax returns for the calendar years 1975 and 1976 with the Internal Revenue Service Center in Ogden, Utah, and paid the tax shown to be due thereon. The Internal Revenue Service (hereafter IRS) then determined deficiencies in the federal income taxes of the principal plaintiffs for the taxable years 1975 and 1976 in the following amounts:

### 1975

| Plaintiff's Name | Tax Deficiency |
|---|---|
| a) Trucks, Inc. | $12,108.00 |
| b) Leroy Hilt | 11,362.00 |
| c) Thomas Hilt | 19,666.00 |
| d) Robert Hilt | 6,637.00 |
| e) Sandra Norris | 5,400.00 |

### 1976

| Plaintiff's Name | Tax Deficiency |
|---|---|
| a) Trucks, Inc. | $31,203.00 |
| b) Leroy Hilt | 57,861.00 |
| c) Thomas Hilt | 28,667.00 |
| d) Robert Hilt | 13,894.00 |
| e) Sandra Norris | 12,148.00 |

The deficiencies resulted from IRS adjustments to the compensation paid to the individual plaintiffs for services they performed in 1975 and 1976 for the family-owned corporations.[3] The plaintiffs paid the deficiencies and the interest thereon in 1980 under protest and also timely filed

---

1. The consolidated cases are: *Trucks, Inc. v. United States of America,* CV. 81–0–70; *Leroy and Molly Hilt v. United States of America,* CV. 81–0–71; *Thomas L. and Katharina Hilt v. United States of America,* CV. 81–0–72; *Robert P. Hilt v. United States of America,* CV. 81–0–73; *Roger W. and Sandra M. Norris v. United States of America,* CV. 81–0–74; *Allyson L. Linton (formerly Hilt) v. United States of America,* CV. 81–0–75; *Steven S. Hilt v. United States of America,* CV. 81–0–76; *Scott L. Hilt v. United States of America,* CV. 81–0–77; *Jess T. Hilt v. United States of America,* CV. 81–0–78; *Kristin M. Norris v. United States of America,* CV. 81–0–79; and *Kimberly D. Norris v. United States of America,* CV. 81–0–80.

2. For purposes of this opinion, when the Court uses the designation "plaintiffs" or "taxpayers," it is referring to Trucks, Inc., Leroy Hilt, Thomas Hilt, Robert Hilt and Sandra Norris only. The other parties named in the various suits are spouses or children of the principal plaintiffs and will be specifically referred to when and if necessary.

3. During the tax years in question, four Hilt family-owned and operated corporations were in existence. They are: Hilt Truck Lines, Inc.; Trucks, Inc.; RTS Investment Corporation (formerly Hilt Investment Corporation); and Hilt Automotive & Tire. Hilt Truck Lines was a

their claims for refund. More than six months elapsed from the time the plaintiffs filed their claims for refund to the time they filed their respective complaints in this Court in 1981. Thus, the plaintiffs have met the jurisdictional prerequisites to bringing these actions. Accordingly, the Court finds that jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1346(a)(1).

For the most part the deficiencies assessed by the IRS resulted from its deter-mination that the amounts the Hilt family-owned corporations paid as compensation to members of the Hilt family who owned and managed the affairs of the corporations were unreasonable and excessive. The positions held by the individual plaintiffs in Hilt Truck Lines, Inc. (hereafter HTL) and Trucks, Inc. (hereafter TI), their percentage of stock ownership, and the salaries and dividends paid to them for the years in question were as follows:

### HTL

#### Subchapter S Corporation

| Name and Title | % of Stock | Salary | | Dividends | |
|---|---|---|---|---|---|
| | | 1975 | 1976 | 1975 | 1976 |
| Leroy—President, Treasurer and Director | 52,1875% | $296,750 | $380,000 | $294,770 | $570,324 |
| Thomas—Vice President, Traffic Director | 15,9375% | 174,400* | 225,000 | 90,020 | 174,171 |
| Robert—Director | 15,9375% | -0- | -0- | 90,020 | 174,171 |
| Sandra—Vice President, Administration and Director | 15,9375% | 114,000 | 153,450 | 90,020 | 174,171 |

### T.I.

#### Regular Corporation

| Name and Title | % of Stock | Salary | | Dividends | |
|---|---|---|---|---|---|
| | | 1975 | 1976 | 1975 | 1976 |
| Thomas—Treasurer and Director | 33–⅓% | -0- | -0- | -0- | -0- |

duly licensed common carrier and had operating authority as an irregular route carrier from the Interstate Commerce Commission. Further, Hilt Truck Lines was a duly elected small business corporation within the meaning of Subchapter S of the Internal Revenue Code (hereafter Code) for the calendar years 1975 and 1976 and was a calendar year taxpayer for such years. The second family-owned corporation, Trucks, Inc., was a regular corporation under Subchapter C of the Code for the calendar years 1975 and 1976, and filed its federal income tax returns, Forms 1120, for the calendar years 1975 and 1976. Trucks, Inc., owned and maintained trailers which were leased to Hilt Truck Lines to transport freight during the years in question. Trucks, Inc., also arranged for the use of tractors which were owned by independent owner-operators. During 1975 and 1976 the Hilt businesses were run from a terminal and repair facility located in Council Bluffs, Iowa, and owned by RTS Investment Corporation, the third Hilt family-owned corporation. The fourth family-owned corporation is Hilt Automotive & Tire which is a dealer in truck parts. Hilt Automotive & Tire was a duly elected small business corporation within the meaning of Subchapter S of the Code for the calendar years 1975 and 1976 and it was an October 31 fiscal year taxpayer for 1975, 1976 and 1977.

| | | | | | |
|---|---|---|---|---|---|
| Robert—President and Director | 33–1/3% | $159,000** | $225,000 | -0- | -0- |
| Sandra—Secretary and Director | 33–1/3% | -0- | -0- | -0- | -0- |

---

\* Thomas also received a management fee of $600 from HAT
\**Robert also received a management fee of $16,000 from RTS

After an audit, the IRS determined that the salaries received by the plaintiffs from HTL and TI exceeded reasonable compensation for their services. The IRS disallowed the following portions of the plaintiffs' salaries for the years in question:

| Year | Leroy | Thomas | Robert | Sandra |
|---|---|---|---|---|
| 1975 | $ 43,023 | $26,133 | $26,133 | $26,133 |
| 1976 | 108,512 | 65,712 | 65,712 | 65,712 |

As a consequence, according to the IRS adjustments, reasonable compensation for the individuals was as follows:

| Year | Leroy | Thomas | Robert | Sandra |
|---|---|---|---|---|
| 1975 | $253,727 | $148,827 | $148,827 | $87,867 |
| 1976 | 271,488 | 159,288 | 159,288 | 87,738 |

The primary effect of these adjustments was to increase the amount of undistributed taxable income which was taxes as an ordinary dividend to the shareholders. The shift from earned salary income to dividend income increased the individuals tax burden on those adjusted amounts from fifty per cent to seventy per cent. Further, in the case of TI, the regular Subchapter C corporation, the adjustments to Robert's salary had the effect of increasing TI's taxable income by the amount of the disallowed salary since those amounts could no longer be deducted as regular business expenses.

Following the same audit, the IRS assessed an additional and separate deficiency against Thomas Hilt regarding the compensation he received from Hilt Automotive & Trucking (hereafter HAT). But in contrast to its determination regarding salaries paid by HTL and TI, the IRS in this matter took the position that Thomas Hilt had been inadequately compensated for the services that he rendered to that corporation. Therefore, the IRS allocated to Thomas Hilt a dividend of $20,000 from HAT for each of 1975 and 1976 to reflect services he rendered to HAT, the Subchapter S corporation owned by the grandchildren of Leroy Hilt.[4]

Thus, there are two separate and distinct issues before this Court: the reasonable compensation issue and the reallocation of income issue. Each will be discussed in turn.

---

**4.** The reallocation of HAT dividends to Thomas Hilt has the effect of reducing the tax liabilities of HAT's six shareholders. Because they have not received any refunds due to the reallocation to Thomas Hilt, the six HAT shareholders filed actions in this Court (CV. Nos. 81-0-75 to 81-0-80 inclusive). The tax deficiency and interest paid by Thomas Hilt does, however, reflect the reallocation of the $20,000 in dividends to Thomas Hilt and are a part of the refund he seeks in his complaint.

## A. REASONABLE COMPENSATION

[1] The initial and central issue presented by this case is whether the amounts HTL and TI paid to Leroy Hilt, Thomas Hilt, Robert Hilt, and Sandra Norris in 1975 and 1976 constitute reasonable compensation within the meaning of Section 162(a)(1).[5] To fall within the ambit of Section 162(a)(1), compensation must be both reasonable in amount and in fact paid purely for services. 26 C.F.R. § 1.162–7(a). In deciding reasonable compensation cases, courts have resolved the question on the basis of an examination of all the facts and circumstances of the case. *Charles Schneider & Co. v. C.I.R.*, 500 F.2d 148, 151 (8th Cir.1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

In this case, the IRS determined that the amounts the plaintiffs characterized as compensation was excessive and beyond the reasonable value of their services. This determination of the IRS is presumptively correct and the plaintiffs bear the burden of proving the reasonableness of the compensation originally claimed. *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Blansett v. United States*, 283 F.2d 474, 479 (8th Cir.1960). In addition courts have held that when a case involves a closely held corporation in which the controlling shareholders-employees set their own compensation, as in this case, special scrutiny must be given to such salaries because there may be a lack of arms-length bargaining as required by Treasury Regulation § 1.162–7(a)(2),[6] *Charles Schneider & Co., supra*, at 152 (Citations omitted). Additionally, compensation paid to employee-shareholders by closely held corporations are subject to careful scrutiny in order to insure that what is really a distribution of dividends may not be passed off as a payment of compensation. *Helen L. Foos*, T.C.Memo 1981–61 (1981).

Courts have considered the following factors, among others, to be relevant in determining whether compensation is reasonable:

1) Employee's qualifications and training;

2) Nature, extent, and scope of his/her duties;

3) Responsibilities and hours involved;

4) Size and complexity of the business;

5) Results of the employee's efforts;

6) Prevailing rates for comparable employees in a comparable business;

7) Ratio of compensation to growth and net income (before salaries and federal income tax) of the business;

8) Absence of the usual fringe benefits such as pension or profit-sharing plan, stock options, etc., which are available to executives of other companies of comparable size;

9) Employee's responsibility for company's inception and/or success;

10) Time of year compensation was determined and by whom;

11) Correlation between stockholder-employee's compensation and his/her stock-holding;

12) Corporate dividend history;

13) Prevailing economic conditions;

---

**5.** 26 U.S.C. § 162(a) provides in relevant part:
§ 162. Trade or business expenses.
(a) In general. There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
(1) a reasonable allowance for salaries or other compensation for personal services actually rendered; . . . .

**6.** Treasury Regulation § 1.162–7(a)(2) provides in relevant part:
(2) The form or method of fixing compensation is not decisive as to deductibility. . . .

Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. 26 C.F.R. § 1.162–7(a).

14) Examination of the financial condition of the company after payment of compensation; and

15) Whether an independent investor would be willing to compensate the employee as he was compensated.

See *Mayson Mfg. Co. v. C.I.R.*, 178 F.2d 115, 119 (6th Cir.1949); *see also Elliotts, Inc. v. C.I.R.*, 716 F.2d 1241 (9th Cir.1983); *Charles Schneider & Co., supra*, at 151–52.

When applying these factors to the facts of this case, the Court will group the factors into three broad categories for discussion purposes. The categories of factors are: performance of employees, salary comparisons, and company conditions.

The first broad category of factors to be considered relates to the work performance of the employees. At this stage the Court must evaluate the qualifications of the employees, the positions held, the hours worked, the duties performed, and the results of the employee's efforts and the employee's responsibility for the company's inception and/or success. Although at all times relevant to this case the executive and managerial functions were performed by the four principal plaintiffs, each individual's performance must be separately assessed. See *C.A. White Trucking Co., Inc. v. C.I.R.*, 601 F.2d 867, 869 (5th Cir. 1979).

Leroy Hilt was the founder of the trucking business that evolved into the various Hilt corporations. In the early years of his business, he performed numerous functions: drove his own truck, did the billing, kept the books, and repaired his own truck. Then as his children assumed more duties in the daily operations of the business, he concentrated his efforts on marketing. During the years in question, he served as the chief executive officer and was primarily responsible for HTL's marketing efforts which were essential to the success of the operation. He worked eighty to one hundred hours per week contacting and soliciting business, old and new. Over the years he achieved the reputation of a "terribly hard competitor and an efficient operator."

Tr. 23:17–24. By 1975 and 1976, he had acquired more than thirty years of executive experience in the trucking business. There can be no doubt that Leroy Hilt possessed significant knowledge, expertise and ability in 1975 and 1976. In fact the government conceded that Leroy Hilt was "an executive of unusual, if not unique, drive and ability." Defendant's proposed finding of fact No. 9.

Although he grew up in his father's trucking business, Thomas Hilt began to work full-time for HTL in 1965. At that time, Thomas Hilt had a bachelor of science in business administration from the University of Nebraska at Lincoln, one year of law school, seven months of training at the College of Advanced Traffic in Chicago, Illinois, and one year and nine months work experience with the Nolte Brothers Trucking Company, Inc. He became an admitted practitioner before the Interstate Commerce Commission in 1970, and thereafter devoted more than fifty per cent of his efforts to the company's ICC work. As a licensed ICC practitioner, he prepared and printed tariffs, protested other trucking firm's applications for routes, and prepared applications and represented HTL at hearings for additional certificates of public convenience and necessity. In connection with the ICC work, he spent over two hundred days per year on the road. His other areas of primary activity included marketing, supervising HTL's internal accounting functions, and designing a computer system for HTL.

Robert Hilt, like his siblings, grew up in his father's business. He operated a small office for HTL while attending the University of Nebraska where he completed degrees in chemistry, math and physics. After military service, he joined the trucking business on a full-time basis in 1969. His primary responsibility was the operation and maintenance of the trailers owned by TI and the management and administration of the maintenance and repair employees, dispatchers, independent tractor-owner operators and their equipment. From 1970 to 1975, he lived day and night on the compa-

ny premises and was technically on call twenty-four hours a day. Generally, he worked ninety to one hundred hours or more per week for the company. In addition to managing the trailer and tractors operations in 1975, he managed the investments of RTS, the Hilt family investment corporation. For this he was paid $16,000 a year.

Sandra Norris, like her brothers, grew up in her father's business and worked for either her father or his company since her high school days. Her primary responsibilities were as office manager and as assistant to the president, her father. She either performed or administered all office and daily accounting work for the trucking operations. She trained all other office employees and supervised them. She herself is trained in both interstate and intrastate regulatory matters. In addition, she was the on-the-scene representative for her father while he was on the road. It was to her that he directed reports, inquiries and requests. She did the follow-up paper work to support his marketing efforts. Leroy Hilt referred to her as his "right-hand." Further she was the company representative who met with auditors from the various regulatory agencies. In 1975 and 1976 Sandra Norris' work week would vary between forty-two and sixty-five hours per week.[7] To reflect the fact that she worked fewer hours than the other plaintiffs, Sandra Norris was paid less than the others.

At all times relevant to this case, the executive and managerial functions and most of the other significant business activities of the Hilt family corporations were conducted by the four individual plaintiffs. They operated as a team and at times their duties overlapped. Each was extremely dedicated to the business and all were well-qualified to perform the functions of top-level executives. The Court concedes that it is not an easy task to ascertain their true worth to this unique trucking operation, but the Court has little doubt that the remarkable success of the Hilt corporations was primarily attributable to the unique capabilities and outstanding performances of Leroy Hilt and his three children.

The second set of factors to be considered focuses on the amount of compensation, rather than the employee. This entails review of the amounts paid, when the amounts were determined, whether they correlated directly to the percentage of stock owned by the employees, whether any fringe benefits or bonuses were paid in addition to the salary, whether any dividends were paid, and lastly and most importantly, how they compared with salaries paid by similar companies for similar services.

In 1975 Leroy Hilt received a salary of $296,750 and a salary of $380,000 in 1976. Thomas Hilt received a salary of $175,000 in 1975 and a $225,000 salary in 1976. Robert Hilt received a salary of $175,000 in 1975 and a $225,000 salary in 1976. Sandra Norris received a salary of $114,000 in 1975 and $153,450 in 1976.[8] In each of the years in question, the amounts of compensation each was to receive was determined at the May and August meetings of the corporate officers and not at the end of the year after the profits were known. In addition, the Hilts did not receive bonuses nor did they have a pension plan. The lack of these fringe benefits have led courts to find high compensation to be reasonable under those circumstances. *Kennedy v. C.I.R.*, 671 F.2d 167, 175 (6th Cir.1982); *see also Paramount Clothing Co., Inc. v. C.I.R.*, T.C. Memo 1979–64 (1979).

Of particular importance to this Court is the fact that the amounts of compensation paid to the Hilts was not directly proportionate to the percentage of stock owned

---

7. The Court is persuaded that Sandra Norris worked full weeks and some evenings and weekends in 1975 and 1976 and therefore gives little weight to the testimony of Mr. Horning who was out of the office thirty-three weeks in 1975 and twenty-six weeks in 1976.

8. In 1975, Roger Norris (husband of Sandra Norris) who was also an employee of TI, received a salary of $61,000 from TI. In 1976 he received a salary of $71,550. Sandra's and Roger's combined salaries equaled the salaries of Thomas and Robert Hilt in 1975 and 1976.

by the plaintiffs.[9] Courts have noted that where compensation paid to officers bears no direct relationship to stockholdings, it tends to show that the amounts paid were actually compensation and not disguised dividends. *Kennedy, supra,* at 175. Further indication that the compensation was not a distribution of profits is the fact that dividends were paid in 1975 and 1976. HTL distributed dividends in excess of $500,000 in 1975 and in excess of $1,000,000 in 1976. Since an absence of profits paid back to the shareholders as dividends justifies an inference that some of the purported compensation really represents a distribution of profits, *Trinity Quarries, Inc. v. United States,* 679 F.2d 205 (11th Cir.1982); *Charles Schneider & Co., supra,* at 153, it is appropriate to infer the converse, namely, that the payment of dividends implies that the compensation was for services actually rendered.

Probably the most significant factor contained within this category involves the comparison of the compensation under consideration and the prevailing rates of compensation to those in similar positions in comparable companies in the same industry. *Charles Schneider & Co., supra,* at 154. Use of comparison evidence is authorized in § 1.162–7(b)(3).[10] Both sides presented expert testimony on this point.

Taxpayers offered the expert testimony of Henry P. Vanderkam, a compensation expert who is employed by Touche Ross & Company and who teaches tax law parttime at Bates College of Law, University of Houston. Vanderkam conducted an exhaustive and impressive study of the Hilt family-owned corporations. Among other things, he made comparisons of HTL with various other truck lines. To determine the prevailing rates of compensation paid by comparable companies in the trucking industry, Vanderkam made various selections of twenty to twenty-five companies[11] from a field of approximately 2,552 truck lines using a Touche Ross core audit program and computer. He compared the amount of compensation paid to the Hilts with HTL's gross freight revenue produced and operating income produced and net income (before salaries) produced. He then did similar comparisons for the randomly selected companies in the industry. When he compared the amounts of earnings which HTL allocated to the payment of executive compensation with similar information of the other companies, he concluded that HTL was not paying excessive executive compensation. His comparison clearly established that the salaries paid to HTL's officer and supervisory team (the Hilts) were at, near, or below the low end of the spectrum for the comparable companies in 1975 and 1976.[12]

9. Leroy Hilt owned 52.1875 per cent and Thomas Hilt, Robert Hilt, and Sandra Norris each owned 15,9375 per cent of HTL's outstanding stock during 1975 and 1976. If stock ownership in HTL determined the amount of payments, then Leroy Hilt would have received more than the actual salaries he drew in 1975 and 1976, and his three children would have received less.

10. Treasury Regulation § 1.162–7(b)(3) provides in relevant part:
   (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the rate when the contract is questioned.
   26 C.F.R. § 1.162–7(b)(3).

11. Vanderkam conducted four separate studies and the field from which the twenty-five companies were selected varied for each of the studies. Some comparables were drawn because of geographic location, some because of size, some because of net revenues and others because they were irregular route carriers.

12. The government seeks to discount this evidence by arguing that reasonable compensation levels for executives cannot be judged in the aggregate and relies on *C.A. White Trucking Co., Inc. v. C.I.R.,* 601 F.2d 867 (5th Cir.1979). The Court in *White Trucking* stated that the salary paid to each employee is to be judged individually, *Id.,* at 869, but not that comparison evidence could not reflect aggregate executive salaries. This Court finds *White Trucking* inapplicable in this context of salary comparisons.

The taxpayers' other witness, Duane Acklie, adopted a different comparability approach and considered the Hilt companies as a straight brokerage operation. He compared the Hilts' salaries with that which they would have received had they simply earned the normal industry brokerage fee for the services they performed. Acklie testified that brokerage commissions for arranging transportation of goods in the trucking business ranged from five per cent to ten per cent of the gross transportation receipts, with seven to eight per cent being the average. In 1975, HTL had gross transportation receipts of $14,128,030.00. In 1976, HTL had gross transportation receipts of $16,558,113.00. Based on these figures, Acklie estimated that at eight per cent, the brokerage fees would have been approximately $1,120,000.00 in 1975 and $1,320,000.00 in 1976. He computed that these amounts were substantially in excess of the total salaries paid to Leroy, Thomas and Sandra.[13]

Dr. Joseph L. Frye, the government's trial witness, was less scientific in his approach than Vanderkam. Frye reviewed the depositions of Leroy and Thomas Hilt and HTL's ICC reports. Then he reviewed the ICC reports from fifty hand-picked corporations. He coupled that information with his general knowledge of prevailing salaries in the industry based on his experience as the graduate placement director for the Department of Marketing and Transportation at the University of Tennessee where he teaches and on his experience as a director of Carolina Freight Carriers, a large private carrier, and Knoxville Transit Authority, a public corporation. Based on his review of the documents and his background, he concluded that reasonable compensation for Leroy was between $75,000

and $85,000 a year and reasonable compensation for Thomas Hilt was $75,000.

The government also offered the deposition testimony of Paul T. Convoy, an executive recruiter, as evidence pursuant to Rule 32(a)(3)(B) of the Federal Rules of Civil Procedure.[14] The testimony of Convoy was that a salary of $65,000 to $75,000 would be reasonable for a chief executive officer of a trucking operation like HTL and that a person with Thomas Hilt's basic responsibilities could be hired at a salary of $45,000 to $55,000 per year with a ten to twenty per cent bonus package. Convoy further testified that reasonable salary for an individual who performed as Robert Hilt did would be $50,000 to $55,000 per year and that a reasonable salary for an office manager like Sandra Norris would range from the mid-$20,000's to low $30,000's.

In evaluating the experts' testimony in this case, the Court finds that it must give much more weight to the scientific and objective comparison studies of Vanderkam than the more subjective approach of the government witnesses.[15] The government witnesses' methodology was far less accurate for comparison purposes. Neither of the government witnesses visited the Hilt business or talked personally with the Hilts. Their methods were far less complete than Vanderkam's. They failed to take into account elements of the other corporations, such as the number of employees, the amount of equity capital, rate of return and whether the company was a regular or irregular route carrier. Also significant to this Court is the fact that the government experts' conclusions were based on preconceived job categories such as chief executive officer, president, vice president, and what services were typically performed by those types of executives. Such a comparison is unfair to these tax-

---

13. The Court notes that when Robert Hilt's salary and Roger Norris' salary are added in, the aggregate executive compensation amount bears a closer relationship to the brokerage fee estimate, but is still less than that amount.

14. Over the objection of plaintiffs, the Court admitted the deposition. The Court finds this evidence admissible in light of Convoy's experi-

ence as an executive recruiter for clients in the transportation industry.

15. The Court gives some weight to Acklie's testimony regarding the brokerage fee approach in that it corroborates the Court's conclusion; however, it does not place controlling weight on that testimony.

payers who performed the jobs of more than one employee on a regular basis. The Court finds the scope of the plaintiffs' duties and activities was broader than those services performed by the "typical officers" and that Frye, and certainly Convoy, did not have a true picture of the plaintiffs' value to the corporation. In sum, the Court finds that Vanderkam's testimony is convincing and credible regarding comparisons of salaries and that the compensation received by the plaintiffs was not excessive in light of Vanderkam's comparison studies.

The third group of factors to be considered deals generally with the company itself. Of importance to courts have been factors such as the character and economic condition of a company, the complexity of the business, the general economic conditions within that same industry, an investor's rate of return, and whether an independent hypothetical investor would approve of the compensation paid.

A review of the corporate economic history of the Hilt family-owned corporations amply demonstrates that the individual plaintiffs were conducting an extraordinarily successful trucking business during the relevant time frame. HTL's taxable income for 1974 was $187,531 and for 1975 it was $564,830, and for 1976, it was $1,092,837. From the end of 1974 to the end of 1976, gross trucking sales for HTL increased approximately $6,500,000, a sixty-four per cent increase over the two-year period. During this same period, the gross revenues of the trucking industry in general increased by only about six per cent. With very little capital investment, HTL was able to generate revenues of $16,940,000 in 1976.

Further, after payment of salaries, there remained for shareholders a high return on the shareholders' equity. HTL and TI's income tax returns disclose the following shareholder returns on invested capital for 1974, 1975 and 1976:

| Year | Rate of Return | |
| --- | --- | --- |
| | HTL | TI |
| 1974 | 284% | 59% |
| 1975 | 855% | 54% |
| 1976 | 1,654% | 29% |

Also, the average rate of return on equity during these years was well above the industry averages. Therefore, it is clear that these rates of return on equity would attract and retain an independent investor. HTL's and TI's earnings on equity remained at a level that would satisfy an independent investor and are a strong indication that the management was providing competent services and that the profits were not being paid out in the form of compensation. *See, e.g., Elliotts, supra,* at 1247.

■ After a careful review of the entire record, this Court is convinced that the amounts paid to Leroy Hilt, Thomas Hilt, Sandra Norris and Robert Hilt for each of the years at issue constituted reasonable compensation for services actually rendered within the ambit of Section 162(a)(1). Therefore, the Court finds that the salary of $296,750 paid by HTL to Leroy Hilt in 1975 was reasonable and that the salary of $380,000 paid by HTL to Leroy Hilt in 1976 was reasonable. The Court finds that the salary of $174,400 paid by HTL to Thomas Hilt in 1975 was reasonable, as was the salary of $225,000 in 1976. The Court finds that the salary of $114,000 paid by HTL to Sandra Norris in 1975 was reasonable and that the salary of $153,450 paid by HTL to Sandra Norris in 1976 was also reasonable. The Court further finds that the salary of $159,000 paid by TI to Robert Hilt and the management fee of $16,000 paid by RTS investment corporation to Robert Hilt, each in 1975 were reasonable, as was the salary of $225,000 paid by TI to Robert Hilt in 1976 and that those amounts were properly deductible by TI as regular business expenses.

These conclusions are based on all those factors previously discussed herein that the Court deems relevant to the facts and circumstances at hand. No single factor has been determinative. The Court finds that the Hilts' qualifications, experience and the success they achieved strongly support the reasonableness of the compensation they received. The evidence clearly demon-

strates that the services performed by Leroy Hilt, Thomas Hilt, Sandra Norris and Robert Hilt were extensive, and that those four individuals were responsible for the remarkable financial success and growth of the Hilt family corporations. It appears to this Court that services, and not capital, constituted the material income-producing factor in these companies and that the services that produced the income were rendered primarily by the four individual plaintiffs.

While the payment of high salaries to owner-employees of closely held corporations warrants close scrutiny to insure that the payments were made for services actually rendered and were not disguised dividends, this Court is convinced that the Hilts earned their compensation. HTL paid substantial dividends for those years, the salaries paid were not directly proportionate to the amount of shares owned and they were determined before year end. Also, there was no pension plan or profit-sharing plan to supplement the compensation paid. Based on Vanderkam's studies, the amounts compared favorably with the executive compensation paid by other trucking companies. In summary, after a careful analysis of all the facts and circumstances, along with a careful weighing of those circumstances, the Court concludes and holds that the plaintiffs have met their burden and have established that the compensation paid to Leroy Hilt, Thomas Hilt, Sandra Norris, and Robert Hilt in the years

1975 and 1976 was reasonable within the meaning of Section 162(a)(1).

## B. REALLOCATION OF INCOME

The second issue in these consolidated proceedings is whether the allocation of $20,000 of dividend income for each of the years 1975 and 1976 to Thomas Hilt from HAT was proper pursuant to Section 1375(c) of the Internal Revenue Code of 1954.[16] Section 1375(c)[17] gives the IRS authority to reallocate to a shareholder in a subchapter S corporation dividends received from the corporation by other members of his family if he rendered services to the corporation at an unreasonably low salary.

Following an audit of HAT's and Thomas Hilt's returns, the IRS determined that $20,000 of the amount treated as dividend income to the HAT shareholders[18] would have to be allocated to Thomas Hilt who was not a record owner of any HAT stock during the years in question. A $20,000 reallocation was made for both 1975 and 1976. According to the IRS, these reallocations of dividend income were made to more accurately reflect the value of the services Thomas Hilt rendered to the corporation during those two years.[19] Thomas Hilt, in fact, received $600 compensation from HAT for the services he rendered in 1975. And in 1976, HTL received a $1,000 management fee for services rendered to HAT by Thomas Hilt who was an employee of HTL. Plaintiffs contend that these amounts were fair and reasonable compen-

16. See pretrial order, pps. 13–14.

17. Code Section 1375(c) provides:

(c) *Treatment of Family Groups.*—Any dividend received by a shareholder from an electing small business corporation including any amount treated as a dividend under section 1373(b) may be apportioned or allocated by the Secretary between or among shareholders of such corporation who are members of such shareholder's family (as defined in section 704(e)(3)), if he determines that such apportionment or allocation is necessary in order to reflect the value of services rendered to the corporation by such shareholders. Code Section 1375(c) was repealed by the Subchapter S Revision Act of 1982, Pub.L. No.

97–354 (1982) and was replaced by Code Section 1366(c).

18. The HAT shareholders were the six grandchildren of Leroy Hilt, four of which are Thomas Hilt's children and two of which are Sandra Norris' children.

19. This is the position taken by the government during the adjudication of pretrial motions for summary judgment. However, the revenue agent who made the reallocations following the audit considered the adjustments to be "salary" and testified during his deposition that he had no basis for giving the allocations dividend treatment at the time he did so. *See* Exhibit No. 71 and Crossan's Deposition, Tr. 84:15–23.

sation for the services Thomas Hilt rendered for HAT in 1975 and 1976 and that the $20,000 reallocation as dividend income from HAT to Thomas Hilt was unreasonable, arbitrary, capricious and improperly based on Code Section 1375(c).

In order for these allocations of dividend income to be proper within the meaning of Code Section 1375(c), the Court must find: (1) that Thomas Hilt was a shareholder of HAT during 1975 and 1976; and (2) that he performed services worth $20,000 each year to the corporation. Because the Court's determination on the nature and extent of Thomas Hilt's services is dispositive on the reallocation issue, it will not be necessary to address the ownership question. Thus, for purposes of this discussion only, the Court assumes *arguendo* that Thomas Hilt was a beneficial owner of HAT stock in 1975 and 1976, and focuses its attention on the question of what value should be given to the services Thomas Hilt rendered to HAT in 1975 and 1976.

In assessing the value of services rendered by a shareholder for Section 1375(c) reallocation purposes, consideration is given to all the facts and circumstances of the business. Treasury Regulation Section 1.1375–3. One tax court, when making a determination on a Section 1375(c) question applied the same criteria used to determine whether compensation is reasonable under Section 162(a). *See Roob v. C.I.R.*, 50 T.C. 890, 891, 898 (1968). Such an extensive review will not, however, be necessary in this case, since the record evidence on this point is so scant. At trial, Thomas Hilt testified that he worked less than ten hours each year on HAT matters. Tr. 148:5–9. The government did not impeach this testimony or offer any evidence whatsoever to rebut the testimony. This is so, even though, Thomas Hilt testified as to the same number of hours during his deposition on April 14, 1982. Thomas Hilt Deposition, Tr. 155:9–13.

The evidence that Thomas Hilt worked no more than ten hours each year in connection with HAT accounting matters is persuasive. This conclusion stems not only from Thomas Hilt's own uncontradicted testimony, but also from the facts found by this Court pertaining to Thomas Hilt's workload for HTL during the same two years. Thus, given the fact that he worked no more than ten hours per year for HAT, the government was unreasonable when it allocated income to him at what would have been a rate of $2000 per hour. Because the Court finds that Thomas Hilt did not render $20,000 worth of services to HAT in 1975 and 1976, it concludes that the IRS allocation based on Section 1375(c) is improper. The Court finds this reallocation of dividend income to Thomas Hilt to be arbitrary, capricious and unreasonable. Further, the principal plaintiffs have met their burden and persuaded this Court that fair and reasonable compensation was properly paid by HAT for the services rendered to it by Thomas Hilt.

## CONCLUSION

Based on the reasoning set forth above, the Court concludes that the salaries paid by HTL to Leroy Hilt, Thomas Hilt and Sandra Norris in 1975 and 1976 were reasonable, and that the salaries paid by TI and RTS to Robert Hilt in 1975 and 1976 were reasonable. Further, the Court concludes that the fair and reasonable value of the services rendered for HAT by Thomas Hilt in 1975 and by HTL through Thomas Hilt in 1976 were the amounts paid by HAT.

Accordingly, a separate order will be entered for judgment in the appropriate amounts in favor of the plaintiffs in CV. Nos. 81–0–70; 81–0–71; 81–0–72; 81–0–73; and 81–0–74, and that cases CV. Nos. 81–0–75; 81–0–76; 81–0–77; 81–0–78; 81–0–79 and 81–0–80 be dismissed. Each party will be ordered to pay its own costs.

The Court will withhold entry of judgment in each case pending the submission by the parties of the computation of the proper amounts of judgment in accordance with this memorandum opinion. If the parties agree on the computations, a stipulation reflecting their agreement and the amounts shall be filed in this Court within

twenty (20) days of receipt of this memorandum opinion. Such stipulation will be without prejudice so far as appeal on the merits is concerned. If the parties do not agree, each must submit their own computations within twenty (20) days of receipt of this memorandum opinion. Thereafter judgments in the appropriate amounts will be entered as determined by the Court.