WEBSTER TOOL & DIE, INC., ROBERT E. AND SHIRLEY A. KEPPELER, DANIEL AND JOYCE SCHLEGEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Webster Tool & Die, Inc. v. Commissioner
Docket No. 9384-83.
United States Tax Court
T.C. Memo 1985-604; 1985 Tax Ct. Memo LEXIS 28; 51 T.C.M. (CCH) 86; T.C.M. (RIA) 85604; December 11, 1985. Patrick J. Lane and William J. Neild, for the petitioners. Sandra M. Gilmore, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: Taxable Year
Petitioner(s)
Ended
Deficiency
Webster Tool & Die, Inc.
August 31, 1979
$40,185
August 31, 1980
94,300
Robert E. & Shirley A. Keppeler
December 31, 1979
5,252
December 31, 1980
12,628
Daniel & Joyce Schlegel
December 31, 1979
5,402
December 31, 1980
13,411
The first issue for decision is whether the amounts paid by Webster Tool & Die, Inc., to its two officer-shareholders, Robert E. Keppeler and Daniel Schlegel, during the taxable years ended August 31, 1979, and August 31, 1980, constitute "a reasonable allowance for salaries or other compensation for personal services actually rendered" within the meaning of section 162(a)(1). [1] The second issue to be resolved is whether the amounts received *30 by petitioners Robert E. Keppeler and Daniel Schlegel are subject to the 50-percent maximum tax upon earned income imposed by section 1348. The final issue before us is whether payments made by Webster Tool & Die, Inc., to two employees on the event of their marriage constitute deductible compensation expenditures. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated by this reference. Robert E. and Shirley A. Keppeler and Daniel and Joyce Schlegel all resided in Webster, New York, at the time of filing the petition in this case. Shirley A. Keppeler, wife of petitioner Robert E. Keppeler, and Joyce Schlegel, wife of petitioner Daniel Schlegel, are parties only because they filed joint Federal income tax returns with their husbands for the taxable years in issue. Use of the individual petitioners' names will, therefore, refer to petitioners-husbands. Webster Tool & Die, Inc. (Webster Tool), is a corporation organized under the laws of New York on September 1, 1967. At *31 the time the petition was filed, the principal office of Webster Tool was located in Webster, New York.Webster Tool filed its Federal income tax returns for the taxable years ended August 31, 1979, and August 31, 1980, with the Internal Revenue Service Center in Andover, Massachusetts. It reports income and expenses on the accrual method of accounting for income tax purposes. At the time of the filing of this petition and during all relevant years, Webster Tool was engaged in the tool and die business, with primary emphasis on prototype sheet metal work. In general, dies are tools used to stamp or form material into a desired product or component. Some components may be produced by a single stamping die, while others are produced using progressive dies, a method which puts the component through a series of dies, each performing a different modification on the particular component. Keppeler was born in 1934 and graduated from vocational high school in Syracuse, New York, in 1951. During high school, he completed a number of machine shop courses. After graduation, he was employed by Smith-Corona Typewriter Works (Smith-Corona) as an apprentice tool maker. After four years, he *32 received his journeyman certificate from the New York State Department of Apprentices. Five years later, he left Smith-Corona and began working for Young and Franklin Tool Works (Young & Franklin) in Liverpool, New York. During his six-year tenure with Young & Franklin, Keppeler concentrated on precision metal work for aerospace companies such as Bendix Corporation, as well as prototype work for General Electric Company and Sylvania. In about 1966, he quit his job with Young & Franklin, sold his home, and moved his family to Rochester, New York, to seek better opportunities in the tool and die industry. His eventual goal was to go into business for himself. In Rochester, Keppeler began working for Accurate Machine and Tool, which was co-owned by Schlegel and Theodore Kokinda (Kokinda). Schlegel was born in 1933 and graduated from Madison Tech Industrial High School in Rochester, New York, in 1952. During high school, he completed a number of machine shop courses. After high school, Schlegel began working for Petson and Rayball Tool and Die (Petson and Rayball) where he completed a four-year apprenticeship and received his journeyman certificate. He continued to work for Petson *33 and Rayball until 1960 or 1961 when, desiring greater challenge in the tool and die business, he began working for High Quall Tool and Machine (High Quall) in East Rochester, New York. At High Quall Schlegel was given greater responsibility in the manufacture of dies, such as fabricating dies directly from sketches. In 1962 or 1963, he left High Quall to go into business for himself. At that time, Schlegel and Kokinda formed Accurate Machine and Tool as equal owners. After a period of growing dissatisfaction with his business relationship with Kokinda, Schlegel was approached about forming a new business by Keppeler, who worked under Schlegel at Accurate Machine and Tool. Subsequently, Kokinda purchased Schlegel's 50-percent ownership interest in Accurate Machine and Tool. Schlegel and Keppeler then incorporated Webster Tool. At the organizational meeting of Webster Tool on October 20, 1967, Schlegel and Keppeler were elected to the board of directors. At the first meeting of the board of directors, Keppeler was elected president and treasurer of Webster Tool and Schlegel was elected vice president and secretary. Keppeler and Schlegel retained their respective offices throughout *34 the period relevant to this case. Webster Tool was capitalized by the issuance of 100 shares of common stock with no par value. Keppeler and Schlegel each agreed to purchase 50 shares for $5,000 cash, for a total capitalization of $10,000. Much of the business of Webster Tool involved the development of prototypes of components desired by its customers. During the taxable years 1979 and 1980, prototype business with Xerox Corporation accounted for about 60-70 percent of the gross sales receipts. Approximately 20 percent of its gross receipts during the taxable years 1979 and 1980 was attributable to business done with Eastman Kodak Company. Typically, personnel from the research and development departments of customers contacted Webster Tool with a design in various stages of development for a component needed for one of their products. The employees of Webster Tool then produced, by hand, a prototype or model of the desired component. If the customers were satisfied with the prototype, Webster Tool generally offered to produce the stamping or forming dies that would be used to produce the component in large quantities. For example, the employees of Webster Tool designed *35 and manufactured a series of dies capable of forming, through approximately 35 separate stations, a precision camera component for Eastman Kodak Company out of sophisticated metal alloys .005 inches thick. The prototype work in which Webster Tool was engaged required more than the manufacture of a component according to a blueprint; the customer also relied upon other expertise of the employees of Webster Tool in the tool and die business. The employees often suggested methods by which the customer could produce the desired component most efficiently. Although the customers' engineers would generally specify the material from which the desired component would be made, the employees of Webster Tool often suggested alternate materials more suitable for a given application. The employees were required to have a broad working knowledge of many materials such as several types of steel alloys, aluminum, beryllium, and copper alloys plus plastics including lexan, delrin, and nylon. The prototype business of Webster Tool required a very high level of proficiency in machining techniques; the components which customers desired often had very low tolerances for deviation from specifications. *36 This precision prototype work also required a substantial investment in sophisticated equipment such as grinding, milling, drilling, cutting, and inspecting equipment. In 1980, Webster Tool spent approximately $150,000 for a computer-operated cutting machine capable of precisely cutting hard steel alloys up to four inches thick. Precision prototype work constituted a large percentage of the business of Webster Tool during the years in issue. The balance of the business involved the manufacture of dies, sheet metal fabrication, metal stamping, retrofit work, and repair work. The business, due in large measure to the successful prototype work, was profitable from the time of incorporation through the years in issue. Keppeler and Schlegel, as officers of the corporation, implemented several practices that were responsible for the profitability. Employee turnover was minimized by maintaining a well-supervised apprentice program and hiring many permanent employees from those who completed their apprenticeship with Webster Tool. To provide pleasant employee working conditions, the machine shop was cooled and the air cleaned of fumes and dust by an elaborate air conditioning and *37 filtering system. Absenteeism was reduced by offering employees a 5-percent increase in gross pay for every week during which they arrived on time and did not leave early. Productivity was improved by implementing a method of subcontracting out some of the work to the employees. Employees worked on these jobs on their own time and at their own pace, receiving in return a percentage of the gross receipts of Webster Tool from that job. This program of subcontracting also decreased the amount of overtime wages paid and gave the contracting employees additional work satisfaction. Webster Tool also maintained an informal profit sharing plan. Schlegel devised a formula for distributing a portion of the profits at the end of each fiscal year to the employees, based upon the profitability of Webster Tool during the year and each employee's length of service and income. The profitability of Webster Tool was also attributable to its management structure. Although it employed approximately 40 persons during the taxable years in issue, Keppeler and Schlegel performed all management functions; there was no middle management. Keppeler and Schlegel divided some of the day-to-day responsibilities *38 of operating Webster Tool, while sharing others. Keppeler served as shop foreman. He was also responsible for the direct supervision and training of apprentices. Keppeler handled approximately 90 percent of all job cost estimation. Schlegel's primary function was to serve as the liaison between Webster Tool and its customers. In addition, Schlegel was responsible for supervising the office staff consisting of, during the years in issue, a single secretary. Schlegel also took responsibility for handling administrative matters related to the apprentice program. Schlegel handled whatever job cost estimating that Keppeler did not. Keppeler and Schlegel together determined the equipment which would be purchased.Keppeler and Schlegel also shared the responsibility for supervising the lone salesman. Keppeler and Schlegel viewed themselves as 50-50 partners. In fact, the offices each assumed in the corporation, Keppeler as President and Treasurer, and Schlegel as Vice President and Secretary, were decided by the flip of a coin. For their efforts, Webster Tool paid Keppeler and Schlegel the following amounts: Total Annual Amounts Paid to Officers
Taxable Year
Ending August 31
Keppeler
Schlegel
Total
1968
$10,500
$10,500
$21,000
1969
10,400
10,400
20,800
1970
26,200
26,200
52,400
1971
28,800
28,800
57,600
1972
35,800
35,800
71,600
1973
34,758
34,200
68,958
1974
78,000
78,000
156,000
1975
41,500
41,500
83,000
1976
36,900
36,900
73,800
1977
85,965
85,965
171,930
1978
198,280
198,281
396,561
1979
175,000
175,000
350,000
1980
252,000
252,000
504,000
*39 The $175,000 payments to Keppeler and Schlegel during the taxable year ended August 31, 1979, were composed of weekly salary totaling $47,000, and lump-sum payments of $105,000 and $23,000 paid to the officer-shareholders on December 12, 1979, and February 27, 1980, respectively. The $252,000 paid to Keppeler and Schlegel during the taxable year ended August 31, 1980, included salary of $1,000 per week ($52,000), plus lump-sum payments of $100,000, $75,000, and $25,000 paid on September 4, 1980, December 28, 1980, and February 6, 1981, respectively. Although the compensation paid to the officers during the taxable years in issue was higher than that paid to officers of some comparable tool and die businesses, there were executives in tool and die companies of comparable size who received greater compensation. Webster Tool paid the premiums on a group term life insurance policy on the lives of Keppeler and Schlegel during the years in issue. These policies, with a stated death benefit of $150,000, named the wives of Keppeler and Schlegel as beneficiaries. Beginning in 1976 and continuing through the years in issue, Webster Tool paid the premiums on whole life insurance policies *40 on the lives of Keppeler and Schlegel. Keppeler and Schlegel were also covered by a group health insurance policy at no cost, as were all of the other employees. Webster Tool also maintained a qualified defined benefit pension plan and trust. During the taxable years in issue, Webster Tool did not maintain company vehicles for the personal benefit of Keppeler and Schlegel. Keppeler and Schlegel drove vehicles owned and maintained by the corporation, but these vehicles were also available for use, and were used, by other employees for business purposes. The officers spent only insignificant amounts on business entertainment. Furthermore, during the years in issue, Webster Tool had no company credit cards. The corporate by-laws authorized the board of directors to set officer compensation. After the initial meeting of the board of directors, minutes of subsequent meetings appear in the corporate minute book only sporadically. Only the minutes for meetings held on August 22, 1974, and August 14, 1975, in which the officers were each awarded additional compensation of $51,500 and $15,000, respectively, mentioned executive compensation. No written employment contract between *41 the corporation and Keppeler and Schlegel was in effect during the taxable years in issue. Prior to setting the amount of executive compensation, Keppeler and Schlegel met with the accountant for Webster Tool. At these meetings, the accountant summarized the preliminary financial statements and advised Keppeler and Schlegel about the compensation that should be paid. In arriving at the recommended compensation figures, the accountant considered the return on equity of the corporation for the years in issue, the retention of adequate working capital, and, as a rough benchmark for executive compensation, 20 percent of sales for the year. Even after deduction of the large amounts paid to Keppeler and Schlegel, the return on equity of Webster Tool[2] was equivalent or superior to that of comparable tooling and machining companies. The year-end rate of return on equity of Webster Tool after taxes for the years in issue was as follows: Taxable Year Ended
Return on Equity
August 31, 1979
17.68 percent
August 31, 1980
30.66 percent
*42 The amounts that Webster Tool paid to Keppeler and Schlegel as salary and bonus expressed as a percentage of gross sales and net income before deducting executive compensation may be summarized as follows: Compensation as
Compensation
Taxable Income
a Percentage of
Taxable
as a
before Deducting
Taxable Income
Year Ended
Percentage
Executive
before Deducting
August 31
Sales
of Sales
Compensation
Compensation
1968
$87,527.10
24.0%
$23,411.40
89.7%
1969
165,353.84
12.6 21,482.28
96.8 1970
294,010.61
17.8 68,771.37
76.2 1971
341,640.78
16.9 81,072.75
71.0 1972
408,495.08
17.5 90,152.52
79.4 1973
499,417.00
13.8 81,408.00
84.7 1974
799,020.00
19.5 259,979.00
60.0 1975
601,020.00
13.8 121,651.00
68.2 1976
566,130.00
13.0 72,672.00
101.6 1977
1,013,570.00
17.0 196,432.00
87.5 1978
1,685,104.00
23.5 556,449.00
71.3 1979
1,871,916.00
18.7 415,359.00
84.3 1980
2,604,222.00
19.4 720.324.00
70.0 From the incorporation of Webster Tool through the years in issue, the total annual amounts paid to Keppeler and Schlegel averaged *43 17.5 percent of sales and 80.1 percent of taxable income before deducting executive compensation. These percentages did not vary significantly during the taxable years ended August 31, 1979, and August 31, 1980. Although the sales and taxable income of Webster Tool generally increased yearly from its inception through the years in issue, there are fluctuations in the rate of growth and even declines in certain years. These fluctuations reflected, in part, the cyclical nature of the tool and die industry. Webster Tool paid no dividends from the date of its incorporation through the years in issue. It accumulated substantial retained earnings. Retained earnings at the end of the taxable years ended August 31, 1979, and August 31, 1980, were $334,297 and $494,803, respectively. On June 27, 1979, Webster Tool issued one of its checks to cash in the amount of $500. It then paid $250 to each of two of its employees on the event of their marriage. It is not known whether these $250 cash payments were included as compensation on the employees' Forms W-2. On its Federal income tax returns for the taxable years ended August 31, 1979, and August 31, 1980, Webster Tool deducted the *44 amounts of $350,000 and $504,000, respectively, as compensation paid to its officers. It also deducted $500 as additional employee compensation on its Federal income tax return for the taxable year ended August 31, 1979, representing the two $250 cash payments made to two of the employees on the event of their marriage. In his statutory notice of deficiency, the Commissioner determined that reasonable officer compensation for the taxable years ended August 31, 1979, and August 31, 1980, was $260,000 and $299,000, respectively. The Commissioner disallowed the deductions to the extent of $90,000 for the taxable year ended August 31, 1979, and $205,000 for the taxable year ended August 31, 1980. The Commissioner also disallowed the deduction of the additional $500 claimed by Webster Tool for employee compensation. The Commissioner allowed a deduction of $50 under the $25 per employee per year gift limit imposed by section 274(b)(1). OPINION The first issue for decision is whether the amounts paid by Webster Tool to its two officer-shareholders during the years in issue are deductible as reasonable compensation for services rendered. *45 Section 162(a)(1) provides that a corporation, in computing its taxable income, is allowed a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on its trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." Webster Tool bears the burden of showing that the amounts paid were in fact reasonable compensation for services rendered and, thus, deductible as an ordinary and necessary business expense. Botany Worsted Mills v. United States,278 U.S. 282, 289-290 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure.
Whether amounts paid to employees represent reasonable compensation for services rendered is a question of fact to be determined on the basis of the particular circumstances in each case. Perlmutter v. Commissioner,44 T.C. 382, 401 (1965), affd. 373 F.2d 45 (10th Cir. 1967). Although there is no definite formula by which the question of the reasonableness *46 of compensation in any particular instance can be determined, Irby Construction Co. v. United States,290 F.2d 824, 826 (Ct. Cl. 1961), we can look to certain factors. Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1155 (1980), enumerates factors that aid in the resolution of this issue. Those factors include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [73 T.C. at 1155-1156 (quoting with approval Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court).] Where the employees to whom the compensation *47 was paid were also in control of the corporation, as in the instant case, the relevant facts must be more closely scrutinized. Home Interior & Gifts, Inc. v. Commissioner,supra at 1156; Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591 (1972). We conclude, after examining all the facts and circumstances, that Webster Tool has met its burden of proof and that the amounts deducted for the compensation paid to its two officer-shareholders were a reasonable allowance for services actually rendered within the meaning of section 162(a)(1). Although we will specifically refer only to those factors upon which we placed the greatest reliance, we have carefully considered all relevant criteria in reaching our decision. The primary factor contributing to the success of Webster Tool from its incorporation through the years in issue was undoubtedly the efforts of its officers, Keppeler and Schlegel. Because of their experience and training, they were masters of their craft. Their expertise allowed the corporation to succeed in specialized and sophisticated prototype machine work. Keppeler and Schlegel's managerical skills were as important *48 to the success of Webster Tool as the technical skills they possessed. Lacking formal management education, Keppeler and Schlegel, nevertheless, instituted procedures that improved productivity and profitability. By eschewing the use of shop foremen and other middle management, Keppeler and Schlegel reduced costs considerably. The 5-percent bonus paid to employees for arriving on time and not leaving early helped to reduce absenteeism. The practice of subcontracting work to its employees reduced labor costs by cutting the amount of overtime hours worked. The subcontracting program and the informal profit sharing plan also improved employee job satisfaction thereby improving productivity and reducing employee turnover. All of the above contributed to profitability during the years in issue. Sales have increased steadily. During the taxable years ending August 31, 1979, and August 31, 1980, sales increased 11 percent and 39 percent, respectively. The amounts of compensation poaid to Keppeler and Schlegel during the taxable years in issue, expressed as a percentage of sales, were 18.7 percent and 19.4 percent, respectively. Although the taxable income of Webster Tool fluctuated *49 from its inception through the years in issue, we attribute most of the variation to the cyclical nature of the tool and die business. The net taxable income increased 231 percent during the taxable year ended August 31, 1980. Although the net taxable income declined during the taxable year ended August 31, 1979, compared to the previous year, Keppeler and Schlegel also awarded themselves correspondingly lower compensation. From incorporation, compensation paid to Keppeler and Schlegel was close to a constant 80 percent of taxable income before deducting their compensation and 20 percent of sales; these percentages did not increase significantly during the years in issue. The return on equity also increased substantially during the years in issue despite the reduction in net income caused by deducting the large amounts of compensation paid to Keppeler and Schlegel. The return on equity of Webster Tool was 17.68 percent for the taxable year ended August 31, 1979, and 30.66 percent for the taxable year ended August 31, 1980. We think a passive investor would be satisfied with such a return on his or her investment. Although the compensation paid Keppeler and Schlegel was at *50 the high end of the range of compensation paid by comparable businesses, we recognize that Webster Tool was profitably engaged in a very sophisticated and narrow portion of the tool and die business. Keppeler and Schlegel's contributions to the success of Webster Tool justified the compensation they received. A troubling aspect of our determination of the reasonableness of the compensation paid to Keppeler and Schlegel is the failure of the corporation to pay dividends. The large year-end compensation awarded to officer-shareholders could be interpreted as an effort to pay dividends to its two shareholders out of the corporation's accumulated earnings. Although the dividend history is a consideration in our determination of the reasonableness of the compensation awarded, it is not determinative. A corporation is not required to pay dividends in all circumstances. Nor will every investor demand the payment of dividends as the method of returning their investment. Depending upon the business and the investor, it may be prudent to reinvest and earnings of the business in the operations, which may include the payment of large, but not excessive, salaries to valued employees. We *51 do not think section 162(c) was intended to permit the Commissioner or the courts to substitute their judgment for the business judgment of corporate directors in regard to the decision to distribute earnings in the form of dividends where the amounts paid to officer-shareholders are otherwise reasonable as compensation. See Laure v. Commissioner,70 T.C. 1087, 1098 (1978), affd. in part and revd. in part on another issue sub nom. Appeal of Laure,653 F.2d 253 (6th Cir. 1981). Respondent called no witnesses nor did he offer any evidence in an attempt to prove that the compensation was unreasonable. Based upon our consideration of all the foregoing facts and circumstances, we conclude that Webster Tool has met its burden of proof regarding the reasonableness of the compensation paid during for the taxable years in issue. Rule 142(a), Tax Court Rules of Practice and Procedure.
Because we have found that the compensation paid to Keppeler and Schlegel was reasonable and that no portion of the compensation represented a distribution of earnings and profits, *52 we need not address the issue concerning the maximum tax on earned income under section 1348. [3]
Finally, we must decide the proper tax treatment of the $250 payments Webster Tool made to two of its employees on the event of their marriage. Section 274 prohibits the deduction of gifts, otherwise deductible as a business or investment expense, to the extent that the value of the gifts to any one individual exceeds $25. The Commissioner determined that the $250 payments to the employees were gifts, and not compensation for services rendered, and, therefore, limited the Webster Tool's deduction for the payments to $50. The evidence does not support a finding that the payments were meant as compensation for services rendered. Keppeler's testimony regarding the payments belies any compensatory purpose for the payments. He stated that these payments were made "[j]ust because they were *53 very valued employees and it was just a gift." Based on the foregoing, we conclude that Webster Tool has not met its burden of proof with respect to this final issue and the Commissioner's determination will be upheld. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. Return on equity is the ratio, expressed as a percentage, of net after-tax income to the sum of contributed capital and retained earnings. This ratio is helpful as one measure of the profitability of a business. We have adopted the return on equity figures, as well as the methodology for arriving at these figures, provided by respondent in his post-trial memorandum.↩
3. Sec. 1348 was repealed effective for taxable years beginning after December 31, 1981, by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, secs. 101(c)(1) and 101(f)(1), 95 Stat. 172, 183, 185.↩