**SHAFFSTALL CORPORATION**

v.

**UNITED STATES of America.**

**No. IP 83–101–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 7, 1986.

---

Lester M. Ponder, Larry J. Strobel, and Kenneth H. Inskeep of Barnes & Thornburg, Indianapolis, Ind., for plaintiff.

Thomas R. Jones, Tax Atty., Dept. of Justice, Washington, D.C., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STECKLER, District Judge.

This matter is before the Court on plaintiff Shaffstall Corporation's suit for a refund of income tax assessed by the Commissioner of the Internal Revenue Service. Based on an audit of plaintiff's tax return for fiscal year 1979, the Commissioner disallowed $89,951.00 of the plaintiff's deduction for compensation paid to Everett L. Shaffstall (Shaffstall). The Commissioner determined that only $282,218.00 was reasonable compensation for Shaffstall's services rather than the $372,169.00 that plaintiff had actually paid to Shaffstall. After paying $55,479.21 of the assessed taxes and interest, plaintiff filed a claim for refund with the Commissioner. The Commissioner did not act on the claim for six months and plaintiff then filed this action. The case was tried to the Court without a jury. Having considered the evidence and the parties' briefs, the Court now enters its findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff, Shaffstall Corporation, is an Indiana corporation with its principal place of business in Indianapolis, Indiana.

2. During the fiscal year ending February 28, 1979 (Fiscal Year 1979), Everett L. Shaffstall was the plaintiff's sole shareholder and chief executive officer. He also performed many other duties.

3. Shaffstall became plaintiff's president in Fiscal Year 1975 after receiving a Masters of Science degree in electrical engineering in 1963 and working in the electronic technology and aerospace industries from 1964 to 1974. Although technically in existence for several years prior to Fiscal Year 1975, plaintiff did not engage in any business activities prior to Shaffstall's arrival. Plaintiff was very modestly capitalized, its shareholders having contributed only the $1,000.00 minimum under state law for its capital stock.

4. During Fiscal Years 1975, 1976, and 1977, Shaffstall and his father, Everett G. Shaffstall, were both 50% shareholders, directors, and officers of the plaintiff. During this period plaintiff developed and manufactured a newswire recording device, the "MDS," which allowed storage of newswire stories on floppy disks. Shaffstall devoted about 75% of his time to the plaintiff's business in those years and was primarily responsible for the design and development of the plaintiff's products, among other duties.

5. In Fiscal Year 1977 Shaffstall concluded that the plaintiff's survival required it to abandon its existing product line, which was rapidly being undercut by competitors, and expand into the electronic telecommunications field with a completely new product line not previously available in the market place.

6. Shaffstall's father disagreed with this approach and elected to leave the corporation in March 1977. Shaffstall acquired full control of the plaintiff at this point and devoted 100% of his time to the corporation.

7. In redirecting plaintiff's business, Shaffstall identified a market need for a product which would allow electronic word processing data to be fed directly into electronic phototypesetting equipment without manually retyping the information. Such a product would "translate" the output of word processors into the input of the phototypesetting equipment, thereby reducing

the printer's labor costs. The widespread incompatibility among the many brands of word processing and phototypesetting equipment previously had frustrated attempts to connect them electronically. Each brand of equipment utilized a different coding system to store data. Accordingly, to develop the product that Shaffstall envisioned, he had to analyze the internal operating systems and codes of each manufacturer's word processors and phototypesetters. Once the codes were analyzed, he had to design software and hardware systems which could "translate" the word for a particular word processor into the code for a particular phototypesetter. To be commercially successful, the product had to be capable of "translating" the code for various major manufacturers' word processors to various major manufacturers' phototypesetter. It also had to be extremely flexible so that it could be easily modified to the application needed by particular customers. Each of these steps required both technical knowledge and an intimate knowledge of the word processing and phototypesetting industries. The various codes were normally proprietary information of the manufacturers, and Shaffstall had to expend considerable time, effort, and ingenuity to obtain this information from the manufacturers, many of whom resisted disclosure of the codes. Shaffstall also had to decipher the information for use in his translator, or "data conversion" device.

8. Having identified this untapped market, Shaffstall conceptualized and developed the technology to make the product feasible, economically practicable, and commercially valuable to potential customers. Shaffstall also directed plaintiff's production and marketing of the data conversion product, which was sold under the trademark "Missing Link." The product reduced typesetting costs for users by 30% to 70%. Moreover, the product could be modified to fulfill specific needs and applications for individual customers. Because of its labor saving benefit to customers, it could pay for itself in one to two years, and sometimes faster.

9. The cost of materials for plaintiff's data conversion product and the physical labor expense incurred in assembling it were relatively modest compared to its purchase price and value to customers. Relatively little capital equipment was required during Fiscal Year 1979 to manufacture the product. Consequently, plaintiff realized a gross profit margin of approximately 70% from the sale of the product during that year.

10. Fiscal year 1978 was a transition year for plaintiff as Shaffstall completed development of the new product. However, the MDS newswire recording device was still plaintiff's principal product in Fiscal Year 1978.

11. Plaintiff introduced the data conversion product in Fiscal Year 1979. The "Missing Link" was extremely successful, completely dominating its market during Fiscal Year 1979. At the same time plaintiff experienced a substantial decline in sales of the MDS newswire recording device, which fell by 55% between Fiscal Year 1978 and Fiscal Year 1979. But for the introduction of plaintiff's new data conversion product, plaintiff would have faced seriously declining financial prospects.

12. Shaffstall's duties and responsibilities during Fiscal Year 1979 included his position as plaintiff's sole executive and managerial employee. Shaffstall also was plaintiff's sole creator and designer of its hardware and software product lines and ensured their engineering quality. Shaffstall's personal services as a researcher and design engineer were the essential driving force behind the development of plaintiff's successful product line and its rapid sales and economic performance.

13. Shaffstall also directed plaintiff's marketing, identifying potential customers and the markets where it should concentrate its efforts. He personally performed many sales and marketing calls, wrote its advertisements, and determined the publications where the ads should appear. Because of the technical sophistication of plaintiff's product and the various applica-

tions for which the products could be used, only Shaffstall could perform many of the marketing functions.

14. Although Shaffstall's brother Tim was designated as "Sales Manager," Tim's lack of a technical background greatly restricted his capabilities in this time frame. Thus, while Tim was undergoing what was essentially an apprenticeship, Shaffstall actually operated as plaintiff's chief salesman. Shaffstall was personally involved in dealing with customers in virtually every sale, even those where Tim was assigned as a salesman.

15. Shaffstall personally was required to make the vast majority of customer service calls. Shaffstall also was responsible for directing plaintiff's personnel and financial affairs.

16. During Fiscal Year 1979 Shaffstall devoted long hours daily to the needs of plaintiff's growing business. Typically, he worked fourteen to sixteen hours per weekday, eight hours on Saturday, and a half-day on Sunday. Shaffstall was required to do so because the functions he performed required application of technical knowledge about the plaintiff's specialized product and the needs of its customers which plaintiff's other employees did not possess.

17. Shaffstall's goal was to have the new product on the market within less than a year after development began so that the "Missing Link" could be identified as the first data conversion device able to serve the new market. Shaffstall perceived a limited "window of opportunity" for the new product and devoted himself totally to the project for the period that it took to develop and get the product accepted in the market before competitors ultimately appeared. In Fiscal Year 1979 the "Missing Link" device had been tailored to tie together existing word processing and phototypesetting equipment. Thus, it was also critical that the product reach the market before technological evolution lead customers to upgrade their equipment, which would require Shaffstall to modify and upgrade his own product to ensure its continued usefulness.

18. Shaffstall handled the development and implementation of almost all aspects of plaintiff's business in Fiscal Year 1979. Without the combination of Shaffstall's special technical expertise, administrative and marketing skill, and entrepreneurial abilities, plaintiff's rapid growth and market domination would not have been possible. It is highly unlikely that anyone else could have been hired to accomplish what Shaffstall did within the time frame in which he did it. He was essentially irreplaceable in the specific situation which faced plaintiff in Fiscal Year 1979.

19. During Fiscal Year 1979, plaintiff had eleven regular employees other than Shaffstall. These employees included some hourly laborers, two technicians who did routine testing and assembly, a field service employee, and a bookkeeper. These persons all worked under Shaffstall's supervision and were trained by him. These employees' duties were routine or ministerial in nature and did not approach Shaffstall's responsibilities in technical sophistication, scope, productivity, or value to plaintiff.

20. Plaintiff's gross sales, net income after taxes, owner's equity, and return on equity for Fiscal Years 1975 through 1979 were as follows:

| Fiscal Year | Gross Sales | Net Income After Taxes | Owner's Equity (Beginning of Year) | Return Equity |
|---|---|---|---|---|
| 1975 | $ 62,187 | $ 21,411 | $ 0 | 2141.0% |
| 1976 | 486,323 | 20,973 | 21,411 | 98.0% |
| 1977 | 373,936 | 18,487 | 42,384 | 43.6% |
| 1978 | 793,832 | 63,221 | 60,871 | 103.9% |
| 1979 | 1,235,081 | 70,316 | 124,092 | 56.7% |

Plaintiff's net income before taxes and return on equity for such years was as follows:

| Fiscal Year | Net Income Before Taxes | Return on Equity |
|---|---|---|
| 1975 | $ 25,615 | 2562.0% |
| 1976 | 25,624 | 119.7% |
| 1977 | 22,637 | 53.4% |
| 1978 | 89,570 | 147.1% |
| 1979 | 103,277 | 83.2% |

21. Plaintiff's owner's equity at the end of Fiscal Year 1979 was $194,408.00. Based on the $1,000.00 initial investment in Fiscal Year 1975, plaintiff's owner's equity grew at a compounded annual rate of 304.1% before taxes and 273% after taxes between Fiscal Year 1975 and Fiscal Year 1979.

22. The return on equity realized by plaintiff between Fiscal Year 1975 and 1979 and the specific rate of return realized in Fiscal Year 1979 were more than adequate to satisfy a hypothetical independent investor.

23. Plaintiff never paid any dividends. Rather, plaintiff anticipated using its net earnings for purposes of future expansion, including construction of a building, and therefore elected to retain such earnings during Fiscal Year 1979 rather than to pay them out as dividends.

24. In Fiscal Years 1976 and 1977, plaintiff compensated Shaffstall through a combination of salary and bonus. In Fiscal Years 1978 and 1979, Shaffstall's sales and marketing activities became significant. Accordingly, Shaffstall was compensated through a combination of salary, bonus, and sales commission.

25. Shaffstall's compensation package for Fiscal Year 1979, adopted at plaintiff's annual Board of Directors meeting on May 2, 1978, provided for a salary of $104,000.00, a sales commission of 10% of gross sales for the year, and a bonus equal to the lesser of 25% of gross sales or 60% of net income before taxes, but not to exceed $150,000.00. Plaintiff's deduction for compensation to Shaffstall for that year was computed as follows: Salary, $94,000.00; commission, $128,169; and bonus, $150,000.00 for a total of $372,169.00.

26. Shaffstall's salary payments totalled $94,000.00 rather than $104,000.00 in Fiscal year 1979 because the increase in salary from $1,000.00 to $2,000.00 per week was not effective until ten weeks into the year.

27. The compensation paid to Shaffstall and deducted by plaintiff for Fiscal Years 1975 through 1979 was as follows:

| Fiscal Year | Salary |
|---|---|
| 1975 | $ 0 |
| 1976 | 56,379 |
| 1977 | 24,820 |
| 1978 | 233,093 |
| 1979 | 372,169 |

28. To acquire the technology for plaintiff's "Missing Link" products, assuming it would even have been available, as well as to hire a technically qualified salesman to market it, plaintiff would have had to expend as much as 30% of its gross sales. Shaffstall, who met both needs as well as others, received compensation equal to 30.1% of sales in Fiscal Year 1979.

29. Shaffstall's personal services enabled plaintiff to produce products with a 69.7% gross profit margin in Fiscal Year 1979. Shaffstall's level of compensation was possible because the product that he personally created was so lucrative.

30. For a company like plaintiff, it was undisputed that compensation to all employees equal to 50% of gross sales would have been reasonable. During Fiscal Year 1979, plaintiff actually paid total employee compensation equal to 42.9% of sales.

31. In Fiscal Year 1978, after an audit, the Internal Revenue Service permitted plaintiff to deduct compensation paid to Shaffstall in the amount of $233,093.00, which was 31.3% of plaintiff's gross sales.

32. Plaintiff filed a timely federal income tax return for Fiscal Year 1979. On its return plaintiff claimed a deduction under § 162 of the Internal Revenue Code of 1954, as amended (the Code), for the $372,169.00 in compensation paid to Shaffstall.

### Conclusions of Law

1. Whether Shaffstall's compensation from plaintiff in Fiscal Year 1979 was reasonable must be determined on the basis of all the facts and circumstances. Plaintiff has the burden of proof. *B.B. Rider Corp. v. C.I.R.*, 725 F.2d 945 (3d Cir.1984).

2. Section 162(a) of the Code allows a deduction for "a reasonable allowance for salaries or other compensation for personal services actually rendered" when such allowances are "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business...." 26 U.S.C. § 162(a).

3. To be deductible, compensation must be both reasonable in amount and paid purely for services rendered. Reg. § 1.162-7(a).

4. The compensation paid by plaintiff was for services rendered by Shaffstall. Therefore, the only question is whether the compensation was reasonable in amount.

5. To determine whether compensation is reasonable the Court must consider the type and extent of the services rendered, the availability of qualified employees, the qualifications and prior earnings of the employee, the contributions of the employee to the business venture, the net earnings of the taxpayer, the prevailing compensation paid to comparable employees, and the peculiar character of the business. *Edwin's, Inc. v. United States*, 501 F.2d 675, 677 (7th Cir.1974). *See Elliott's, Inc. v. C.I.R.*, 716 F.2d 1241, 1244-45 (9th Cir.1983).

6. Because of plaintiff's unique product, with a 69.7% profit margin and a dominant market position achieved under Shaffstall's guidance, the reasonableness of Shaffstall's compensation cannot be evaluated by reference to salaries paid by typical companies in broad industry groups, such as electrical equipment manufacturing. A realistic comparison, if possible at all, would be to high technology growth companies in the electronics field, and particularly companies with very successful products. However, published compensation surveys do not exist for such a category of companies. Furthermore, evidence as to the average market-wide salaries for chief executive officers in other industries is of little value in evaluating Shaffstall's compensation because of plaintiff's special market position and because of Shaffstall's unique services for plaintiff. Absent comparative data, the Court must look at the qualifications and responsibilities of the employee and the actual services performed. *Petro-Chem Marketing Co. v. United States*, 602 F.2d 959, 963, 221 Ct.Cl. 211 (1979).

7. Another consideration is whether a hypothetical independent investor would be satisfied with the rate of return on his investment. If earnings are at a level to satisfy an independent investor, then there is a strong indication that the management employee is receiving reasonable compensation for his services. *Elliotts, Inc. v. C.I.R.*, 716 F.2d at 1247.

8. As an employee, Shaffstall possessed a combination of abilities and expertise. During Fiscal Year 1979, he worked ex-

tremely long hours on behalf of plaintiff and simultaneously performed a variety of essential duties. Shaffstall identified an untapped market and designed and directed production of the product filling that market need within the short time period required to exploit that market in advance of the competition. Shafstall's intensive efforts in Fiscal Years 1978 and 1979 enabled the "Missing Link" product to be identified as the first and only product performing valuable function for customers. The ability to be first in the market place was a great advantage that permitted plaintiff to reap lucrative returns in Fiscal Year 1979.

9. Shaffstall was the driving force behind the business and his personal services were almost single-handedly responsible for the success that it realized in Fiscal Year 1979.

10. Plaintiff's gross profit margin of approximately 70% during Fiscal Year 1979 was possible in part because of Shaffstall's personal services. Even after payment of Shaffstall's compensation, a significant amount of each sales dollar remained to compensate the other employees and the shareholder contributions.

11. Shaffstall's efforts as the creator of plaintiff's successful product must be given substantial weight in evaluating the reasonableness of his compensation. In addition, the Court has also considered that Shaffstall's executive responsibilities included marketing and sales, personnel, financial affairs, quality control and other managerial duties. Shaffstall's product knowledge and client rapport made him invaluable to plaintiff as its chief salesperson in fact during Fiscal Year 1979. Plaintiff could not have marketed its "Missing Link" products without Shaffstall's substantial personal participation in and overall supervision of marketing and sales.

■ 12. The compensation package adopted by plaintiff for Shaffstall was a logical and reasonable method of compensating an executive, like Shaffstall, who was essential in fulfilling multiple roles in the plaintiff's business. By combining an annual salary, a sales commission, and a bonus based on corporate performance, plaintiff matched the compensation with Shaffstall's separate roles as corporate executive, salesman, and product creator. The structure and amount of each component of the compensation package were reasonable in light of Shaffstall's contributions to plaintiff in such roles. *See Elliotts, Inc. v. C.I.R.*, 716 F.2d at 1246.

■ 13. Plaintiff's compensation plan for Shaffstall was adopted early in the fiscal year before the favorable financial results had materialized. It had a cap on the amount of the bonus, which ensured that the incentive pay would be restricted to a maximum targeted amount deemed commensurate with Shaffstall's worth and plaintiff's ability to pay. The plan was geared to reward performance. It was the kind of key officer compensation plan that an independent investor would want in place for a speculative high technology startup venture. There is no reason that an owner-employee should be prohibited from receiving amounts under an incentive compensation plan if the same plan would have been reasonable for a nonowner employee. *Id.* at 1248.

14. While Shaffstall's salary increased by 59.7% between Fiscal Year 1978 and Fiscal Year 1979, plaintiff's gross sales increased by 66% during that time period. Shaffstall's compensation in Fiscal Year 1979 as a percentage of sales (30.1%) was actually less than that approved by the Internal Revenue Service in Fiscal Year 1978 (31.3%).

■ 15. Except for a $1,000.00 capital contribution, plaintiff's owner's equity was generated through the retention of earnings. Plaintiff's annual return on equity in Fiscal Year 1979 of 83.2% before taxes, and 56.7% after taxes, establishes that profits were not being siphoned out of the company disguised as salary. It also indicates that an independent investor would have been satisfied with the financial results which Shaffstall's services were making possible and would have approved of plaintiff's compensation plan for Shaffstall. *Id.*

at 1247; *Webster Tool & Die, Inc. v. Commissioner,* 51 T.C.M. 86 (1985); *Trucks, Inc. v. United States,* 588 F.Supp. 638 (Neb.1984), *aff'd,* 763 F.2d 339 (8th Cir. 1985).

16. All other potential contributors to plaintiff's business were being well compensated, including other employees and including the shareholder's interests. There is no evidence that Shaffstall, through his compensation, was expropriating income properly belonging to other employees or to investors.

17. The evidence indicates that plaintiff would have had to pay amounts at least equal to or possibly greater than Shaffstall's compensation in Fiscal Year 1979 to even have a reasonable opportunity to develop, manufacture, and market the "Missing Link" product in Shaffstall's absence, and even then success would have been far from assured.

18. Plaintiff's overall expenses for employee compensation were well within the limits of reasonableness, as agreed by the Government's expert witness. The question then becomes whether the relative allocation of such compensation between Shaffstall and the other employees reasonably reflected the relative values of their respective contributions to plaintiff's success. In light of Shaffstall's unique and extensive services and the ministerial duties of the other employees, such allocation was reasonable. *See Trucks, Inc.,* 588 F.Supp. at 643.

19. Because plaintiff was a relatively new company and anticipated the need for internally generated capital, the absence of dividend payments in Fiscal Year 1979 was the product of reasonable business judgment and not a factor that the Court gives substantial weight in determining the reasonableness of Shaffstall's compensation. There is no legal requirement that a corporation pay dividends, and shareholders often are content with the appreciation in the value of their stock realized because of the retention of corporate earnings. *Elliot's, Inc.,* 716 F.2d at 1244–45; *Edwins, Inc.,* 501 F.2d at 677.

20. The Code was not intended to allow the Commissioner or the Court to substitute their judgment for the judgment of the corporate directors regarding the distribution of corporate earnings when the compensation to the employee-shareholder is reasonable. *Webster,* 51 T.C.M. at 91.

21. The evidence of Shaffstall's base salary for the year beginning October 1983, after plaintiff was acquired by another company, was without relevance to the reasonableness of Shaffstall's compensation fixed five and one-half years earlier because the nature of Shaffstall's duties, plaintiff's internal organization, and the circumstances facing plaintiff internally and externally had changed so dramatically as to render any attempted comparison meaningless.

22. Based on all the facts and circumstances, the Court concludes that the $372,169.00 in compensation paid by plaintiff to Shaffstall during Fiscal Year 1979 was reasonable within the meaning of § 162(a).

23. The Commissioner erred in his determination that the deduction for compensation paid to Shaffstall must be reduced by $89,951.00 and erred in failing to allow plaintiff's claim for refund. Plaintiff has overpaid its taxes in the amount of $42,887.00 for Fiscal Year 1979 and is entitled to a refund of such taxes, together with interest previously paid in the amount of $12,593.51 and statutory interest on such amounts as provided by law.

24. To the extent necessary to support the judgment granted herein, any finding of fact in this entry may be considered a conclusion of law, and any conclusion of law may be considered a finding of fact.