RTS INVESTMENT CORPORATION, ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent RTS Inv. Corp. v. CommissionerDocket Nos. 1584-83, 4971-83, 4972-83, 4973-83, 4974-83, 4975-83, 3135-84, 7823-84, 7824-84, 7825-84, 7826-84, 2480-85, 9422-85, 9423-85, 9424-85, 9425-85, 9426-85, 9427-85, 9428-85, 9429-85.United States Tax CourtT.C. Memo 1987-98; 1987 Tax Ct. Memo LEXIS 94; 53 T.C.M. (CCH) 171; T.C.M. (RIA) 87098; February 17, 1987. Michael O. Johanns and *95 Jim R. Titus, for the petitioners. Albert B. Kerkhove, for the respondent. COHENMEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: TaxablePetitionerDocket No.Year EndedDeficiencyLeRoy and Molly Hilt4975-8312-31-77$50,812.00Robert P. Hilt4971-8312-31-7746,137.0012-31-7867,183.009429-8512-31-7940,628.007823-8412-31-805,689.219426-8512-31-81635,658.0012-31-82286,221.00Roger W. and4973-8312-31-7732,107.00Sandra M. Norris12-31-7835,305.009428-8512-31-7920,918.007824-8412-31-8011,728.399422-8512-31-81485,913.0012-31-82227,191.00Thomas L. and4974-8312-31-7743,109.00Katharina Hilt12-31-7844,708.00Thomas L. Hilt7825-8412-31-8085,670.72Thomas L. and9423-8512-31-81346,697.00Norma J. Hilt12-31-82196,776.00Trucks, Inc.4972-8312-31-77124,761.0012-31-7880,586.009424-8512-31-7993,738.007826-8412-31-8056,967.009425-8512-31-81790,727.00RTS Investment1584-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,000.00Corporation8-31-7946,668.003135-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,000.002480-858-31-81517,167.009427-858-31-82587,377.00*96 The principal issue for which these cases were consolidated is whether amounts paid directly or indirectly for salaries and management fees to shareholder employees of closely held corporations during the years in issue constitute reasonable compensation for services rendered. After concessions, the only other issues are whether LeRoy and Molly Hilt failed to report $294 of taxable income in 1977 and whether Robert Hilt failed to report $29,167 of taxable income in 1978. FINDINGS OF FACT Some of the facts have been stipulated. The facts set forth in the stipulations and exhibits are incorporated in our findings by this reference. The facts surrounding the reasonable compensation issue primarily involve LeRoy Hilt and his three children (the children), Robert P. Hilt (Robert Hilt), Sandra M. Norris (Sandra Norris), and Thomas L. Hilt (Thomas Hilt) (collectively, the Hilts); and the following entities: Trucks, Inc. (Trucks Inc.), RTS Investment Corporation (RTS), Hilt Truck Line, Inc. (Hilt Truck Line), and Western Services Partnership (Western Services). Petitioners LeRoy and Molly Hilt resided in Las Vegas, Nevada, when their petition was filed. The remaining individual*97 petitioners resided in Omaha, Nebraska, when their petitions were filed. All of the individual petitioners' Forms 1040, U.S. Individual Income Tax Returns, placed in issue by respondent were prepared on the cash basis and filed with the Internal Revenue Service Center in Ogden, Utah (the Ogden Service Center). Petitioner RTS had its principal office in Council Bluffs, Iowa, when its petitions were filed. It filed 1978 through 1982 Forms 1120, U.S. Corporation Income Tax Returns, and a 1979 Form 1120X, Amended U.S. Corporation Income Tax Return, with the Ogden Service Center. Its returns were prepared on the accrual basis and for taxable years ended August 31. Petitioner Trucks Inc. had its principal office in Council Bluffs, Iowa, when its petitions were filed. It filed 1977 through 1981 Forms 1120, U.S. Corporation Income Tax Returns, with the Ogden Service Center. Its returns were prepared on the accrual basis and for calendar years. Hilt Truck Line, an electing small business corporation, filed 1977 through 1982 Forms 1120S, U.S. Small Business Corporation Income Tax Returns, with the Ogden Service Center. Its returns were prepared on the cash basis and for calendar years. *98 Western Services filed 1978, 1980, and 1981 Forms 1065, U.S. Partnership Returns of Income, with the Ogden Service Center. Its returns were prepared on the cash basis and for calendar years, except that its 1978 return was for a short year, January 2 through December 31. History of the BusinessesLeRoy Hilt began a trucking business out of the basement of his Nebraska home in about 1932. The business was a sole proprietorship for which LeRoy Hilt performed essentially all necessary functions, i.e., operations, sales, and marketing. He incorporated the business as Hilt Truck Line, Inc., in 1961 and elected treatment as a small business corporation under Subchapter S of the Internal Revenue Code. In the late 1960's, the business operations were moved to a new location. Hilt Truck Line did not own tractors or trailers but subcontracted work to independent contractors. LeRoy Hilt's children worked at the trucking business on a part-time basis, including weekends, while they were in grade school. Sandra Norris, who did not attend college, began working full time for the company in the mid 1960's. She performed the bulk of the office work. Thomas Hilt graduated from the*99 University of Nebraska, majoring in accounting and economics. He completed approximately 1 year of law school and thereafter attended the College of Advanced Traffic in Chicago, Illinois, to study Interstate Commerce Commission (ICC) law and related subjects. From 1963 to 1965, Thomas Hilt worked as general manager for Nolte Brothers Truck Line, a business in which the Hilt family held an interest, and, in about 1965, he began to work full time for his father's business. Robert Hilt attended the University of Nebraska but did not complete college. He served in the military for approximately 1 year in Vietnam and thereafter returned to work full time for the family business in about 1968. Hilt Truck Line was a motor common carrier authorized by a certificate of public convenience and necessity issued by the ICC. Also, Hilt Truck Line was the only licensed carrier for U.S. Customs in "all 48 states." Permits were required to be filed in every state from which, to which, and through which the company's hired trucks transported goods or other merchandise. A substantial amount of paperwork was required for each trip and on each driver; Sandra Norris completed such paperwork in the*100 office. Thomas Hilt's primary responsibility with the company was administrative; although it was not common for trucking companies to have their own ICC practitioner (most would hire an attorney), Thomas Hilt handled the bulk of this work and his father handled the rest. The ICC work included the required filing of tariffs, which were publications describing the company's rates and conditions for hauling. In addition to the tariffs and other required filings with the ICC, Thomas Hilt was often involved in ICC hearings, which occupied substantial amounts of time. The ICC workload declined, however, when the industry was deregulated in 1980. Thomas Hilt also performed certain legal work for the company, maintained the financial records, and signed the company's tax returns. Most motor carriers operated through brokers. A broker would obtain a load of freight and call an ICC carrier to move the freight. The brokers typically charged an average standard fee of 7 to 8 percent. Hilt Truck Line did not commission brokers but performed a similar function itself, in two ways. First, approximately 40 percent of Hilt Truck line's business was conducted through the "trip lease," where*101 a tractor-trailer operator needed, for example, a one-way "return" load. Second, approximately 60 percent of Hilt Truck Line's business was conducted through Trucks Inc., which owned trailers that were leased to Hilt Truck Line. Hilt Truck Line was owned as follows in 1977: LeRoy Hilt334 sharesRobert Hilt102 sharesThomas Hilt102 sharesSandra Norris102 sharesOn or about March 1, 1977, LeRoy and Molly Hilt moved their residence to Las Vegas, Nevada. At the end of 1977, LeRoy Hilt's stock was redeemed by the corporation, and for the remaining years in issue, 1978 through 1982, Hilt Truck Line was owned in equal shares by the children. The Board of Directors of Hilt Truck Line, which was composed of the Hilts, held annual meetings each May. The officers of Hilt Truck Line, which included one nonfamily member, Norma Kuebler, were determined at the annual meetings for the years in issue as follows: 1977LeRoy HiltPresident and TreasurerThomas HiltVice President-TrafficSandra NorrisVice President-AdministrativeMolly HiltSecretary1978 - 1982Thomas HiltPresident and TreasurerNorma KueblerVice PresidentSandra NorrisSecretary*102 At the May 1977 meeting, the board resolved to pay the following amounts of bonuses and total compensation: BonusTotalLeRoy Hilt$125,750$743,250Thomas Hilt73,500397,500Sandra Norris50,500297,500The resolution also included a statement that "[t]he increase for LeRoy Hilt for 1977 is to be a one time increment to compensate for past services and continued outstanding leadership." At a special December 1977 meeting, the directors resolved that the corporation redeem the shares held by LeRoy Hilt, and he thereupon resigned as an officer and director of the company. At the May 1978 meeting, the directors resolved (1) to pay Thomas Hilt and Sandra Norris salaries in 1978 of $350,000 and $237,500, respectively, and (2) to engage Western Services to provide management services in 1978 for $330,000. At the May 1979 through 1982 meetings, the directors did not discuss or otherwise determine anyone's salary; however, they did resolve to engage the management services of Western Services for "reasonable compensation." The minutes for annual meetings prior to the years in issue describe compensation to officers as follows: YearLeRoy HiltThomas HiltSandra Norris1971$20,000$26,000$15,600"AdditionalCompensation"40,00024,000"For pastservicesrendered"120,00050,000Total180,000100,00015,600 1972189,900105,50076,184 1973189,900111,30376,184 1974237,375139,12891,375 1975296,750174,400114,0001976380,000225,000153,450*103 During the years in issue, Hilt Truck Line never maintained more than five employees, including its officers. On its Forms 1120S, Hilt Truck Line reported the following amounts of sales, income, and compensation: Officers SalariesandYearGross SalesTotal IncomeTaxable IncomeManagement Fees1977$16,528,330$2,904,032$627,467 $1,438,250   197816,910,0042,329,26160,380 917,499197916,597,2841,931,738(205)337,011198017,943,8313,426,31343 1,905,221  198115,631,7932,123,7841,863 937,423198214,091,2571,303,388(398,452)765,160On its balance sheets filed with the tax returns, Hilt Truck Line reported the following end of the year amounts of total assets, total liabilities, and total owners' equity: YearTotal AssetsTotal LiabilitiesTotal Owners' Equity1977$2,390,580$2,283,180$107,400 19781,649,3222,109,009 (459,687)19791,346,6421,866,912 (520,270)198098,743618,970   (520,227)198140,443559,850   (519,407)198235,443955,165   (919,722)On each of the returns for years 1977 through*104 1982, Hilt Truck Line did not report any dividend distributions out of current year's income. It did report each shareholder's share of undistributed taxable income, most of which was usually distributed in January of the following year, and each officer's amount of compensation as follows: Shareholders' Share of UndistributedTaxable IncomeYearRobert HiltThomas HiltSandra Norris1977$209,155 $209,156 $209,156 197820,126 20,127 20,127 1979(68)(68)(69)198014 15 14 1981621 621 621 1982(132,817)(132,818)(132,817)Compensation of Officers - SalariesYearLeRoy HiltThomas HiltSandra Norris1977$743,250$397,500$297,500 1978349,999237,500197970,654266,3571980768,346296,8751981498,463309,9601982466,660298,500Hilt Truck Line also reported deductions (without further explanation on the return) for management fees as follows: 1978$330,0001980840,0001981165,000Western Services, a partnership owned in equal shares by the children during the years in issue, filed partnership returns describing*105 its principal business activity as management services. On its 1978, 1980, and 1981 returns, Western Services reported the following amounts of gross receipts: 1978$330,0001980840,0001981165,000On the same returns, Western Services also reported the following amounts of each partner's share of ordinary income and net earnings: Ordinary IncomeYearRobert HiltThomas HiltSandra Norris1978$110,000$110,000$110,0001980279,987 279,986 279,986 198155,000  55,000  55,000  Net EarningsYearRobert HiltThomas HiltSandra Norris1978$110,000$110,000$110,0001980267,090 267,090 267,089 198155,000  55,000  55,000  Petitioner Trucks Inc., a Nebraska corporation, was formed in about 1969 and was owned in equal shares during the years in issue by the children. 2 They were the directors of the corporation during the years in issue (as were LeRoy and Molly Hilt in 1977 and 1978) and its officers: Robert HiltPresidentThomas HiltVice President and TreasurerSandra NorrisSecretary*106 Trucks Inc. did not own tractors but purchased semitrailers which it leased to Hilt Truck Line. Trucks Inc. obtained independent contractors, or owner operators, who were paid on a mileage basis. Robert Hilt performed a majority of the services for Trucks Inc. The minutes of the January 1977 annual meeting of the board of directors of Trucks Inc. describe a resolution to pay salaries in 1977 to Robert Hilt and Roger Norris (Sandra Norris' husband) of $364,000 and $39,300. The minutes of the January 1978 annual meeting describe resolutions to pay Robert Hilt a salary of $145,833 and a bonus of $73,500 (for "exemplary services") and to pay Robco, a name Robert Hilt occasionally used in reference to his management services, $175,000 for management services. On its Forms 1120 for the years in issue, Trucks Inc. described its principal business activity as leasing motor vehicle equipment and reported the following: CompensationOtherOtherTaxableto OfficersIncomeDeductionsYear(To Robert Hilt)(Mgt. fees)(Mgt. Services)1977$437,500$24,0001978145,833 8,000  $175,000 1979428,500198036,000 400,0001981156,000518,333*107 Trucks Inc. paid no dividends during years in issue. On Robert Hilt's 1978, 1979, and 1980 individual income tax returns, he reported as "other income" amounts received for "Management Services, Robco" of $175,000, $428,500, and $400,000, respectively. On his 1981 and 1982 returns, he reported no other income but business income, on Schedule C, of $480,500 (for services) and $474,150 (for consulting director: services), respectively. Petitioner RTS, a Nebraska corporation, was owned in equal shares during the years in issue by the children. They were the directors of RTS during the years in issue and it officers: Robert HiltPresidentThomas HiltVice President and TreasurerSandra NorrisSecretaryThe purpose of the corporation was to invest in virtually anything that might turn a profit. Initially, the company purchased land and constructed a trucking terminal in Council Bluffs, Iowa. The family business was moved into the terminal before it was completed in December 1969. In about February or March of the same year, the terminal was burglarized. As a result, Robert Hilt moved into the terminal and lived there through 1975, after which he*108 stayed there only periodically. Although LeRoy Hilt held neither an ownership interest in nor an employed position with RTS, his advice on various investments was often solicited by the children. In the mid-1970's, RTS asked LeRoy Hilt to manage its investment in a bank in Lyons, Nebraska. Because of its share of the ownership, RTS was granted a seat on the bank's board of directors. LeRoy Hilt filled that seat and served as chairman of the board for several years. The bank, which was in serious financial difficulty at the beginning of RTS's involvement, eventually became quite successful. RTS acquired an interest in a second bank, in Iowa, that was in similar, if not worse, financial disarray. As before, LeRoy Hilt became involved in management and served on the board of directors. Regarding both banks, LeRoy Hilt received and reviewed daily reports and participated in investment decisions on behalf of both banks. RTS also purchased a Nebraska farm of approximately 1,500 acres in the early to mid-1970's. LeRoy Hilt managed the farm for RTS and made decisions including crop rotation. On its 1977 through 1981 Forms 1120, RTS reported the following: Other deductions:Tax YearCompensationSalary andMgt. Fees orEndedof OfficersWagesServices8/31/78$94,6668/31/79100,0008/31/80100,0008/31/81120,0008/31/82$284,983304,667*109 The amounts deducted for management fees or services included the following payments to LeRoy Hilt: Tax YearEndedLeRoy Hilt8/31/78$66,6678/31/79100,0008/31/80100,000The minutes of the September 1978, 1979, and 1980 annual meetings of the board of directors of RTS describe resolutions that the payments to LeRoy Hilt were management fees for necessary management services. On his 1978 and 1979 state income tax returns filed with the State of Nebraska, LeRoy Hilt reported as income from Nebraska sources management fees of $66,667 and $133,333; however, on or about June 12, 1982, he filed amendments to both returns claiming that these amounts should not have been reported as income from the State of Nebraska and that they are actually income from Nevada sources. A letter dated November 11, 1982, addressed to the Nebraska Department of Revenue from LeRoy Hilt's accountant represented that LeRoy and Molly Hilt moved to Las Vegas, Nevada, to "build up the business activities of Hilt Truck Line" and that because he performed these services in Nevada, they were not properly includable in Nebraska income. On its 1977 through 1980 Forms 1120, RTS identified*110 itself and Trucks Inc. as a controlled group pursuant to section 1563(a). 3 On its 1981 Form 1120, RTS reported the plan of reorganization whereby RTS received the assets and liabilities of Trucks Inc. and became the transferee of Trucks Inc., effective January 1, 1982. There was substantial overlap among all the Hilt business described above. Hilt Truck Line, RTS, and Trucks Inc. all reported the same mailing address on their tax returns and operated out of the same offices at the terminal. Until his stock was redeemed in 1977, LeRoy Hilt managed sales and marketing and made the major decisions involving the trucking business; thereafter, the decision-making was generally shared by the Hilt children. Although Sandra Norris ran the office, Thomas Hilt tended to ICC and administrative matters, and Robert Hilt oversaw the operations through Trucks Inc., these individuals were quite knowledgeable of each others' duties as well as the business as a whole. Any problems, especially with highway accidents or other problems with trucks*111 in route, were generally directed to Robert Hilt at the terminal, and, if he was unavailable, one of the other Hilts would tend to the matter. The trucking business often required one of the Hilts, usually Robert Hilt because he lived in the terminal for a while, to be on call 24 hours a day. The Hilts' workload during the years in issue was approximately as follows: Sandra Norris45-60 hrs/weekRobert Hilt80-100 hrs/weekThomas Hilt80 hrs/weekLeRoy Hilt (1977)100 hrs/weekAlthough the overall operation of the trucking business required considerable travel by one or more of the Hilts, the family often gathered to discuss business. At such meetings, the Hilts, among other things, determined their respective compensation. The years in issue were somewhat volatile years for the trucking industry, marked by a fuel crisis in about 1979 and a rise in the price of diesel fuel of approximately 45 to 50 cents per gallon. In spite of sharp increases in the price of fuel, the hauling rates charged by Hilt Truck Line were governed by tariffs on file with the ICC, which required 30 to 60 days to process changes in those tariffs. Profitability within the overall*112 industry, as well as for Hilt Truck Line, fell dramatically. In his notices of deficiency to the individual petitioners, respondent determined the following amounts of disallowed and allowed personal service income: Salary (S)/IndividualTaxableManagementAmountAmountPetitionerYearFee (M)DisallowedAllowedLeRoy Hilt1977$743,250 (S) $441,898.00$301,352.00Robert Hilt1977437,500 (S)  260,690.00176,810.001978145,833 (S)  81,993.0063,840.00285,000 (M)  160,221.00124,779.001979428,500 (M)  203,953.00224,547.001980667,090 (M)  390,933.00276,157.001981480,500 (M)  175,706.00304,794.00Thomas Hilt1977397,500 (S/M)  220,690.00176,810.001978349,999 (S/M)  148,612.00201,387.00110,000 (M)  110,000.000.0019801,035,436 (S/M)785,357.07250,078.931981498,463 (S/M)  222,451.00276,012.001982466,660 (S/M)  173,728.00292,932.00Sandra Norris1977297,500 (S/M)  193,293.00104,207.001978237,500 (S/M)  123,086.00114,414.00110,000 (M)  110,000.000.001979267,184 (S/M)  139,612.00127,572.001980563,964 (S/M)  406,871.00157,093.001981309,960 (S/M)  136,576.00173,384.001982298,500 (S/M)  114,488.00184,012.00*113 In certain notices of deficiency, respondent determined the following amounts of disallowed and allowed deductions for salaries and/or management fees by Trucks Inc.: TaxableAmountAmountAmountYearClaimedDisallowedAllowed1977$437,500$260,690$176,8101978145,83381,99363,840175,00098,39276,6081979428,500203,953224,5471980400,000123,843276,1571981518,333518,3330In certain notices of deficiency, respondent disallowed deductions for the following claimed payments of management fees by RTS: TaxableAmountYearDisallowedPayee8/31/78$66,667LeRoy Hilt8/31/79100,000LeRoy Hilt8/31/80100,000LeRoy Hilt8/31/81120,000Not determined instatutory notice8/31/82304,667Not determined instatutory notice,but paid to RobertHilt and reportedby him asSchedule C incomefor 1982OPINION Reasonable Compensation IssueRespondent determined amounts of reasonable compensation for the individual petitioners during the years in issue. Accordingly, deductions for salaries and management fees paid by the related businesses were*114 disallowed to the extent they exceeded these amounts. Deficiencies were also determined for the individual petitioners because, inter alia, the amounts in excess of reasonable compensation would not be personal service income and thus would not be subject to the 50 percent maximum tax limit on personal service income for taxable years beginning prior to January 1, 1982. Section 1348. Personal service income as used in section 1348(b)(1) incorporates the definition of "earned income" in section 911(b). Section 911(b) provides, in pertinent part: (b) Definition of Earned Income. -- For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. * * * Thus, any portion of the distributions received by the Hilts in excess of reasonable compensation is not earned income and, for*115 taxable years beginning prior to January 1, 1982, must be subject to a maximum tax rate of 70 percent instead of 50 percent. Section 162(a)(1) provides: (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; To qualify under section 162(a)(1), compensation must be both reasonable in amount and paid purely for services. Section 1.162-7(a), Income Tax Regs. This test is characterized as having two prongs, the second of which requires proof of "compensating purpose." See Elliotts, Inc. v. Commissioner,716 F.2d 1241, 1243 (9th Cir. 1983), revg. on another issue and remanding a Memorandum Opinion of this Court; Nor-Cal Adjusters v. Commissioner,503 F.2d 359, 362 (9th Cir. 1974). Due to the subjective nature of determining whether compensation was paid purely for services, courts generally focus only on the reasonableness prong (see, e.g., Pacific Grains, Inc. v. Commissioner,399 F.2d 603 (9th Cir. 1968)),*116 unless the Commissioner presents evidence that the payments were disguised dividends (see, e.g. Klamath, Medical Service Bureau v. Commissioner,29 T.C. 339, 348-349 (1957), affd. 261 F.2d 842 (9th Cir. 1958)). Elliotts, Inc. v. Commissioner,supra.To determine whether compensation is reasonable, we must examine all the relevant facts and circumstances. Home Interiors and Gifts, Inc. v. Commissioner,73 T.C. 1142, 1155 (1980), and cases cited therein. Factors that have been considered by courts addressing the issue of reasonable compensation include the following: the employee's qualification; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the*117 particular employee in previous years. * * * [Home Interiors and Gifts, Inc. v. Commissioner,73 T.C. at 1155-1156, quoting Mayson Manufacturing Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), reversing a Memorandum Opinion of this Court.] No single factor is dispositive of the issue; instead, the Court's decision must be based upon a careful consideration of applicable factors in light of the relevant facts. See Mayson Manufacturing Co. v. Commissioner,supra.Where the corporation is controlled by officer/employees who set their own compensation, as in this case, special scrutiny must be given to such salaries. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 152 (8th Cir. 1974), affg. a Memorandum Opinion of this Court. The test of reasonableness should not be applied to the officers as a group but rather to each officer's salary in light of the individual services performed. L. Schepp Co. v. Commissioner,25 B.T.A. 419 (1932). Respondent's determination is presumptively correct, and the taxpayer has the burden of proving otherwise. Botany Worsted Mills v. United States,278 U.S. 282 (1929);*118 Rule 142(a), Tax Court Rules of Practice and Procedure. If petitioners successfully prove error, the Court must then determine what was reasonable compensation under the particular facts and circumstances. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975). Section 1.162-7(b), Income Tax Regs., provides in pertinent part: (1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. * * * (2) The form or method of fixing compensation is not decisive as to deductibility. * * * (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration*119 are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. [Emphasis supplied.] Respondent's determinations generally concern the reasonableness of payments of salaries and/or management fees (1) by Hilt Truck Lines to LeRoy Hilt, to Sandra Norris, to Thomas Hilt, and to Western Services, (2) by RTS to Trucks Inc., to Robert Hilt, and to LeRoy Hilt, and (3) by Trucks Inc. to Robert Hilt. Respondent argues that the amounts paid and at issue here were not the result of arm's-length negotiations and that petitioners have not otherwise established that the amounts constituted reasonable compensation in view of the necessary criteria. Petitioners do not dispute the lack of arm's-length negotiations; however, petitioners insist that the evidence supports their contentions that the amounts in issue were paid as reasonable compensation for services rendered. Petitioners also argue that services, and not capital, constitute the material income-producing factor in the Hilt companies. Petitioners continuously refer to and rely upon the case Trucks, Inc. et al. v. United States,588 F. Supp. 638 (D. Neb. 1984),*120 where the district court found reasonable, and therefore deductible, salaries paid in 1975 and 1976 by Hilt Truck Line and Trucks Inc. to certain of the individual petitioners in this case. Petitioners contend that respondent has "disregarded the findings of the U.S. District Court" and is attempting to relitigate that case. We note however that, although the law in the area of reasonable compensation is essentially unchanged, the district court considered lesser amounts of compensation paid in different (earlier) taxable years not involving all of the entities in the case before us. See Commissioner v. Sunnen,333 U.S. 591, 597-599 (1948). Robert Hilt, Thomas Hilt, and Sandra Norris received indirect payments from Hilt Truck Line through their partnership, Western Services. In 1978, 1980, and 1981, Hilt Truck Line paid Western Services for management fees. Western Services thereupon distributed equal portions to each of the Hilt partners. Respondent argues that these distributions were disguised dividends from Hilt Truck Line. Although we do not specifically characterize the amounts as "dividends" (because Hilt Truck Line was a subchapter S corporation), we*121 must agree that the funds channeled through Western Services were in the nature of dividends, i.e., distributions of earnings and profits. Section 1.162-8, Income Tax Regs.; see Klamath MedicalService Bureau v. Commissioner,supra.The payments to the Hilt children were proportionate to their holdings in Hilt Truck Line and irrespective of individual duties and qualifications. The years that the children received payments from Western Services, i.e., 1978, 1980, and 1981, were Hilt Truck Line's only profitable years, in terms of taxable income, of the years Hilt Truck Line contracted the "services" of Western Services. Thus, the financial success of Hilt Truck Line appears to have been the only distinguishing factor between years Western Services, and hence the children, received payments (1978, 1980 or 1981) and years it did not (1979 and 1982). No evidence indicates that the "services" provided by the children differed in one group of years from the other. Moreover, petitioners do not explain (1) any business purpose of Western Services other than alleged ICC compliance, (2) the nature of their services (to Hilt Truck Line) through Western Services, *122 or (3) why their services would be any different from what they would have otherwise performed without Western Services. LeRoy Hilt received a salary of $743,250 from Hilt Truck Line in 1977. Of this amount, respondent determined that only $301,352 was reasonable compensation. After considering the applicable factors, we sustain respondent's determination. Of all the Hilts, LeRoy Hilt was undoubtedly the most qualified and the most experienced in terms of operating a trucking business. He founded the Hilt trucking business, made all major decisions, and was the driving force behind its growth and success throughout many years. Justifiably, he received substantially larger salaries than the other Hilts -- usually about 80 percent more than Thomas Hilt and 150 percent more than Sandra Norris. From 1972 through 1976, LeRoy Hilt's salary steadily increased approximately 25 percent per year, but, in 1977, the increase was 96 percent. Even considering the individual qualities and experience of LeRoy Hilt, the evidence simply fails to justify such an increase or to support the reasonableness of the amount paid. We recognize that the compensation allowed as reasonable by respondent*123 in 1977 is about $80,000 less than LeRoy Hilt's salary in 1976; however, LeRoy Hilt had then moved from Nebraska to Las Vegas, Nevada, and, although his work there was concentrated on west coast company operations, we are not persuaded that he maintained either the same degree of control of overall company business or his intense working style after the move. Thomas Hilt and Sandra Norris received direct payments for salary and/or management fees from Hilt Truck Line, and Robert Hilt received both direct and indirect payments from both Trucks Inc. and RTS. Only a portion of each of these payments was allowed as reasonable compensation by respondent. In applying the requisite factors, because of the overlapping of the three companies and the overlapping of the children's responsibilities and activities among the three companies, we have disregarded the separate identities of the companies but have considered the children individually. Both parties introduced extensive expert testimony. Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702*124 . Such evidence must be weighed in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955); Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; In re Williams' Estate,256 F.2d 217, 219 (9th Cir. 1958), affg. a Memorandum Opinion of this Court. Petitioners' expert on reasonable compensation was Henry Vanderkam (Vanderkam), who was, at the time of trial, the senior*125 partner in a Texas law firm. Vanderkam was also a CPA with several years experience at the accounting firm Touche Ross & Co. His experience in the area of reasonable compensation included (1) a number of surveys and evaluations of executive compensation, (2) consulting work relating to stock option plans, and (3) opinion testimony on behalf of numerous taxpayers whose salaries had been challenged by the Internal Revenue Service (IRS) as not reasonable. At the time of trial in March 1986, Vanderkam had visited the Hilt operation in Council Bluffs, Iowa, on six occasions, beginning in 1982. He had interviewed LeRoy Hilt, Robert Hilt, Thomas Hilt, and Sandra Norris, as well as certain members of the shop crew and truck drivers. He also had visited officers of competing companies to assess their views of the Hilt operation. As a result of these interviews, Vanderkam formed the opinion that "Hilt Truck Line, Inc. and the individual family members [named above] * * * are in fact unique to the trucking industry." Vanderkam found significant the intensity and dedication of the Hilts, the long hours they worked, and their "unique * * * results oriented" management style. Vanderkam*126 prepared a report including comparisons of Hilt Truck Line to other common carriers, specifically, carriers classified as follows: Reporting Carriers Class I Carriers Class II Carriers General Freight Carriers Specialized Carriers Class I General Freight Carriers Class I Intercity General Freight Carriers The data necessary for these comparisons was secured from Hilt Truck Line tax returns and the 1977 through 1982 "Motor Carrier Annual Reports, Results of Operations, Class I and II Motor Carriers of Property Regulated by the I.C.C." Vanderkam used only a nationwide sample and not a regional or state sample because he concluded that any variation would be statistically insignificant. He made no attempt to compare Hilt Truck Line to carriers of like revenue because he believed that such comparison "would be equally as statistically insignificant." The statistical information compiled by Vanderkam and set forth in his report did not include compensation paid by any firms or compare such compensation to the amounts here in dispute. Instead, Vanderkam compared Hilt Truck Line to other firms, in the above classifications, on the basis of the following categories: *127 Return on Equity Before Officers Salaries Return on Equity Gross Revenue per Employee Officers Salaries and Total Wages and Benefits as a Percentage of Revenues Earnings per Employee Before Payroll and Fringe Benefits After Tax Earnings Per Employee According to Vanderkam's report, Hilt Truck Line performed extraordinarily well in the various categories during certain of the years in issue. For example, Vanderkam described Hilt Truck Line's return on equity and, for comparison, the 6-year averages of the categories, as follows: Hilt Truck LineReturn on Equity1977949.67%  197891.39%  1979- .31%  1980.0065%19812.82%  1982- 603.06%  Return on EquitySix Year AverageAll Reporting Carriers10.02%Class I Carriers10.17%Class II Carriers10.05%General Freight Carriers9.23%Specialized Carriers11.67%Class I General Freight Carriers9.30%Class I Intercity GeneralFreight Carriers9.32%Hilt Truck Lines, Inc.73.52%Respondent challenged the authenticity of figures Vanderkam used for certain of his comparisons. In all of his equity ratios for Hilt Truck Line, Vanderkam*128 apparently used $66,072, the amount of the original investment in Hilt Truck Line, as its equity. This figure, however, does not comport with the amount of owners' equity described in Hilt Truck Line's tax returns in issue. In any event, Vanderkam's opinion was not oriented toward establishing amounts of reasonable compensation by describing what comparable firms pay their executives. Rather, he only attempted to justify the amounts paid by the Hilt companies by showing how unique the Hilt executives were and by showing how superior Hilt Truck Line was compared to other trucking companies in terms of certain overall performance categories. Although Vanderkam was emphatic with regard to the number of hours per week each of the Hilts worked, he had conducted no research on the effect of number of hours worked on the total compensation of shareholder officers. Moreover, Vanderkam's experience in reasonable compensation was limited solely to rendering opinions to support taxpayers who are seeking to justify past salaries. He had never, at the time of this trial, recommended salaries in the trucking industry for future years. One of respondent's experts on reasonable compensation*129 was E. James Brennan III (Brennan), who was, at the time of trial, president of Brennan, Thomsen Associates, Inc., a consulting firm on personnel and pay practices. Brennan's experience in reasonable compensation included books, articles, speeches and broadcast interviews on executive compensation, salary administration, comparable worth and personnel management. His firm's list of clientele included members of both the private and public sectors. At the time of trial, Brennan was involved with the analysis and recommendation of executive compensation for future years of approximately 28 to 30 trucking firms which he described as small and closely held. Brennan was retained as a pre-trial consultant and expert witness on personnel management and pay practices, particularly in the area of executive compensation, by the U.S. Department of Justice, the Department of Energy, the U.S. Marshals Service, and the Internal Revenue Service (IRS). In this case, Brennan's firm was retained by the IRS to determine the maximum levels of reasonable compensation for the officer/shareholders of Hilt Truck Line, Trucks Inc., and RTS. To make this determination, Brennan used the same methodology*130 used by him to project executive compensation for future years, which includes assessment of the statistical average as well as the maximum limit. Thus, for purposes of Brennan's report, a) information was gathered and studied to identify the highest-paying positions in each industry consistent with the functions of the individuals and the characteristics of their company; b) the actual pay practices of the industries in question were analyzed to identify the actual normal and high pay amounts for like services in like enterprises under like conditions. Based on his analysis, Brennan concluded that "[n]o transportation firm of equivalent size in the country paid as much to its individual top executives as did Hilt Truck Line," and that the Hilts were thus paid amounts in excess of reasonable compensation. Brennan's comparative compensation analysis was based primarily on data compiled by the American Management Association (AMA) in its executive compensation service survey of top executive pay in the transportation industry. The AMA statistics were categorized according to total pay by position and by revenue size. Brennan believed that size is the primary prediction*131 of executive compensation. Because "executive compensation practices of firms with sales revenues of 50 to 100 million dollars are substantially more generous than the pay rates of firms whose revenues never exceeded 20 million dollars," Brennan compared Hilt Truck Line to transportation firms whose sales were in the 10 to 30 million dollar range or whose asset size closely approximated the companies in question. Brennan, like Vanderkam, ignored geographic pay differentials. At his request, to prevent any initial bias, all the preliminary statistical and survey data was collected and compiled without Brennan's knowledge of the actual amounts paid to the officer/employees in question. Brennan interviewed the Hilts at a meeting which lasted approximately 3 hours. As a result, in order to make the salary comparisons, Brennan considered the Hilts' descriptions of their responsibilities and classified each of them for each of the years in issue, as either a chief executive officer (CEO), a chief operating officer (COO), or an executive vice-president (ExecVP): LeRoyRobertThomasSandraYearHiltHiltHiltNorris1977CEOCEOCOOExecVP1978COOCEOExecVP1979CEO4COO1980COOCEOExecVP1981COOCEOExecVP1982CEOCOOExecVP*132 In making such classifications, Brennan noted that the Hilts did not necessarily provide services equal or approximate to those provided by the comparable positions, whose work descriptions typically indicated "larger jobs" than the Hilts; however, he believed that such comparisons were favorable to the Hilts.Brennan determined and explained the following "'maximum reasonable' total pay amounts": RevenueYear(in millions)CEOCOOExecVP197716.287$ 93,008$57,743$134,987 197817.228147,51987,268107,933197916.547140,78488,344N/A198016.466144,767242,219123,124198115.459132,284135,282118,173198214.091170,61687,005116,740197727$109,227$69,935$152,783 197828169,666103,236117,223197928169,419106,190N/A198029174,695296,961137,881198128167,963158,722137,991198215174,10789,018118,526Two sets of maximum reasonable figures were presented. The first reflects the maximum amounts paid in total compensation for firms*133 with the same revenue as Hilt Truck Line. The second is a rough aggregation of all three firms (Hilt [Truck Line], Trucks [Inc.], and RTS) to show the effect of treating all three firms as one composite organization. Brennan's use of maximums involved the examination of salary ranges; however, his focus was not on averages but the "highest figure[s] that could be defended as factual." Thus he concluded the he could determine "a ceiling beyond which no other organization has paid." Regarding the Hilts' workload, according to Brennan, No research has ever shown any positive relationship between the hours of executive work and top executive pay. On the contrary, all available evidence indicates that chief executives who manage their firms so efficiently that they work mere forty-hour weeks or less and delegate routine tasks to subordinates are paid much more than those who work long hours, refuse to delegate detail, perform tasks of a non-executive nature and refuse or decline to train and develop competent subordinate executives. Respondent's other expert on reasonable compensation was Ernest Gruenfeld (Gruenfeld), who was, at the time of trial, a financial analyst with*134 the IRS Valuation Analysis Section. His major area of work was in determining value of closely held securities. Gruenfeld prepared a Valuation Report wherein he determined the following amounts of reasonable compensation during the years in issue for each of the Hilts from RTS, Trucks Inc., and Hilt Truck Line, combined: Reasonable Compensation(in thousand)197719781979198019811982LeRoy Hilt$160* $ 67* $133* $100$ 0 $ 0 Thomas Hilt13020071200240270Robert Hilt130200200150180270Sandra Norris100150170130155180$520$617$574$580$575$720In order to determine "what would ordinarily be paid for like services by like enterprises under like circumstances," Gruenfeld's report compiled three sets of data: (a) aggregate compensation (b) compensation for individual positions (c) compensation for specific comparable positions For purposes of the second set of data, Gruenfeld ranked the four Hilts from 1 to 4, reflecting the highest to lowest salary received each year. From surveys of*135 executive compensation in the transportation industry by the AMA Top Management Report, the Financial Executives Institute, and the Research Institute of America, Gruenfeld determined that the number 1 position in firms in the transportation industry was never paid more than $120,000 (on the average), the number 2 position was not paid more than $97,000, the number 3 position was paid less than $80,000, and the number 4 position was paid less than $75,000. For purposes of the third set of data, comparing Hilt Truck Line to other trucking firms, Gruenfeld obtained data from the ICC and limited the comparison to trucking companies in Iowa and Nebraska with revenues comparable to Hilt Truck Line. As a result, Gruenfeld determined that the amounts paid to the Hilts were substantially higher than other comparable executives. He also noted that Hilt Truck Line's ratio of total compensation to revenue was always much higher than other companies. In this case, we have devoted considerable time to analyzing the expert witnesses -- their reports, their testimony, and their rebuttal testimony. We have found the opinion of respondent's expert Brennan to be the most persuasive. His credentials*136 were unmatched by the other experts, his report was well documented, and his conclusions were supported by considerable factual data. Although we do not adopt the specific amounts of reasonable compensation determined by Brennan, we accept his methodology and his general conclusions about reasonable compensation of executives in the transportation industry. Petitioners argue that Brennan's analysis and opinion are defective because he categorized the Hilts and compared their compensation to other officers within the same category. Petitioners contend that the Hilts "simply defied categorization" because their responsibilities were not so clearly defined and because they each performed the work of several employees. Petitioners cite language in the district court case, Trucks, Inc. v. United States,588 F. Supp. 638, 646-647 (D. Neb. 1984), and in Elliotts, Inc. v. Commissioner,716 F.2d 1241, 1246 (9th Cir. 1983), revg. and remanding a Memorandum Opinion of this Court. In the latter case, the Court of Appeals for the Ninth Circuit stated that if a taxpayer performed the work of three people in a comparable firm, the relevant comparison would*137 be the combined salaries of those three people. 5 In this case, however, the evidence indicates only that the Hilts worked long hours and shared responsibilities and decision-making; it does not establish that any one of them performed the work of more than one employee in a comparable concern, as found by the district court on the evidence before it. We are thus unpersuaded that categorizing is not proper where, as here, the categorizations were based on individually described job functions and responsibilities.Petitioners also argue that Brennan's analysis and opinion were defective because he compared a trucking business to other "transportation" firms, which includes all forms of transportation over land and water, not just the trucking industry. While we agree that the category is broader than petitioners' business, we are not persuaded that such a comparison is overly broad or otherwise defeats our purpose here. 6 Deciding where properly to draw the line in determining comparability of business entities is no simple task; however, we believe that Brennan's choices of comparable*138 factors were satisfactory in producing firms of adequate comparability and, in any event, were the most persuasive of the methods supported by the evidence. As we stated earlier, we do not adopt the specific amounts of compensation determined by Brennan. Primarily, our reason relates to the performance of the Hilts. Sandra Norris, who did not have a college degree, was responsible for managing the offices. Robert Hilt, who also did not have a college degree, was more of a general operations coordinator, and he worked primarily through Trucks Inc. Thomas Hilt, who held a college degree and a license to practice before the ICC and who had attended a year of law school, was responsible for administrative matters in the company. Thomas Hilt was therefore paid the highest amount of compensation and allowed the highest amount as reasonable by respondent. Although the qualifications of the three and their respective roles in the businesses do not support as reasonable the amounts of compensation actually paid, we are nevertheless impressed by their long hours, the dedication to their work, *139 and the existence of the family unit working together as a team and sharing in the ownership and management. These characteristics made each more valuable than he or she would have been in other separate concerns and thus more valuable than most of the determinations by Brennan. We have considered other factors as well. No particular salary policy was exhibited by any of the Hilt companies. In certain years, the directors of Hilt Truck Line set the officers' salaries during board meetings but provided no explanation for the amounts. LeRoy Hilt's testimony suggests that the salaries were usually based on need and desire instead of merit and services: Q. During this time frame again [1970-1977], who set salaries? A. Probably all of us, as far as that was concerned, we probably held a meeting on it. As far as that was concerned, I might have said, well, what do you need to work, or what do you need to get by, we usually set it at the first of the year. Robert Hilt's testimony was consistent with his father's: Well, up until my dad left, he determined what our salaries were. After that, it was pretty informal, we would meet at the end of the year and decide what*140 we were going to pay ourselves next year. Although the compensation paid to the Hilts in 1972 through 1976 increased roughly 25 percent per year, the amounts paid during the years in issue were substantially greater than, often double, those paid in 1975 and 1976; the record does not justify such an increase. Also, the general economic condition of the industry and of Hilt Truck Line declined during the years in issue. We have thus considered the relevant factors in deciding reasonable compensation for the Hilt children. Based on all of the evidence, we conclude that reasonable compensation for the children was no greater than the amounts determined by respondent, except as set forth below. Petitioners argue that, in general, all of the Hilts were undercompensated in prior years. They also advance specific arguments of undercompensation of Thomas Hilt by Hilt Truck Line in 1979 and LeRoy Hilt by RTS in the early 1970's. Courts generally allow current deductions for compensation for past services, Lucas v. Ox Fibre Brush Co.,281 U.S. 115 (1930), "even if the amount paid exceeds a reasonable allowance for current services." Cropland Chemical Corp. v. Commissioner,75 T.C. 288, 297 (1980),*141 affd. in an unreported opinion 665 F.2d 1050 (7th Cir. 1981). The evidence, however, must indicate the amount of undercompensation. American Foundry v. Commissioner,59 T.C. 231, 239-240 (1972), affd. on this issue 536 F.2d 289 (9th Cir. 1976). Petitioners do not elaborate on the general argument; moreover, the evidence indicates that LeRoy Hilt and Thomas Hilt were paid in 1971 for past services. Although the minutes of the 1977 meeting of the board of directors of Hilt Truck Line state that LeRoy Hilt is being compensated for past services, it does not describe, nor does the record otherwise establish, any amount of undercompensation or when it occurred. Petitioners argue that Hilt Truck Line paid additional amounts to Thomas Hilt in 1980 because he was undercompensated in 1979. The evidence reveals that Thomas Hilt received substantially more income in 1980 ($1,035,436) than he received in 1979 ($70,6540), a year for which Thomas Hilt's salary was not challenged by the IRS. Robert Hilt testified that Hilt Truck Line was operating at a loss in 1979, that Thomas Hilt agreed to take a small salary that year on condition that he could*142 make it up in 1980, and that he and Sandra Norris agreed to the plan. This testimony was credible and unimpeached and, although the minutes of the annual meetings of the board of directors are silent as to the agreement, no other evidence contradicts the testimony. Moreover, the amount paid to Thomas Hilt in 1979 was substantially less than the amounts allowed by respondent in 1978 and 1980, and the evidence reveals no change in Thomas Hilt's performance and responsibility in 1979. Accordingly, we allow an additional amount of $154,346 as reasonable in 1980, based on an approximate amount of reasonable compensation to Thomas Hilt for his services in 1979 of $225,000 7 minus the actual compensation received of $70,654. Petitioners argue that RTS paid amounts to LeRoy Hilt in 1978, 1979, and 1980 for management services performed in those respective years as well as in prior years in which he received no compensation from RTS. Respondent disallowed the amounts in their entirety because RTS had not established that*143 they were bona fide deductions or otherwise reasonable compensation. LeRoy Hilt testified that the amounts were installment payments for services in prior years. The minutes of the annual meeting of the board of directors of RTS describe resolutions approving the payments to LeRoy Hilt for management services but fail to mention past services or that these were part of an installment plan. The assertions as to past services, however, are contradicted by representations made by LeRoy Hilt to the State of Nebraska in an apparent attempt to avoid state income tax for 1978 and 1979. Moreover, aside from these claims, contradicted by other evidence, that the payments were for services in prior years, there is no evidence that LeRoy Hilt performed services for RTS in 1978, 1979, and 1980. The deductions claimed by RTS are therefore not allowed. Respondent disallowed the entire deduction for management fees claimed by Trucks Inc. in 1981, $518.333. The evidence shows that $480,500 of this amount was paid to Robert Hilt for management services. Respondent argued on brief that Trucks Inc. is entitled to a deduction no greater than $304,794, the amount determined to be reasonable compensation*144 for Robert Hilt in 1981. We have agreed that this amount is a reasonable allowance for Robert Hilt's services in 1981, and because petitioners have not proven (1) who received the payments equal to the difference between $518,333 and $480,500 or (2) what services were performed for those payments, Trucks Inc. is entitled to a deduction for management services in 1981 for only the amount determined to be reasonable compensation to Robert Hilt, $304,794. Respondent disallowed management fees claimed by RTS during its fiscal years ended in 1981 and 1982. Petitioners argue that the amount claimed in 1981 was actually paid to Trucks Inc. for the services of Robert Hilt. Because reasonable compensation for Robert Hilt in 1981 has been determined, and because the amounts paid directly to Robert Hilt from Trucks Inc. exceeded this reasonable allowance, any amount paid by RTS to Trucks Inc. for Robert Hilt's services is thus in excess of reasonable compensation. The deduction by RTS in 1981 must be disallowed. Regarding the amounts claimed by RTS in 1982, however, the evidence, including respondent's expert's testimony, suggests that they were not more than reasonable compensation for*145 Robert Hilt's services in 1982. The amounts were reported by him and taxed to him as business income. RTS is entitled to the deduction for management fees claimed in 1982. Robert Hilt IssueThe only issue remaining with regard to Robert Hilt is whether he failed to report $29,167 of income in 1978. Petitioner offered a Trucks Inc. check made out to "Robco of Nevada" for that amount. The check was dated December 29, 1978. Robert Hilt endorsed the check and deposited it on January 2, 1979. Petitioner testified that he did not receive the check until 1979 and therefore argues that he properly excluded it from 1978 income and included it in 1979 income. In general, checks delivered to a taxpayer are income in the year of delivery. Kahler v. Commissioner,18 T.C. 31 (1952). Petitioner bears the burden of proof. Welch v. Helvering,290 U.S. 111 (1933). Petitioner's testimony was credible and unimpeached, and we believe him. Thus, in the absence of any argument by respondent of constructive receipt, 8 we conclude that petitioner properly reported the item. LeRoy Hilt IssueRespondent*146 determined that LeRoy Hilt failed to report income in 1977 attributable to an agricultural subsidy of $294 paid to him by a Government agency. Robert Hilt testified that LeRoy Hilt received the check when he was managing the farm operations for RTS because the agency assumed it was due him and that he simply endorsed the check over to RTS. In light of Robert Hilt's credible testimony and the lack of any evidence to the contrary, we conclude that petitioner properly omitted the item from his 1977 income. Decisions will be entered for the respondent in docket Nos. 4972-83, 7826-84, 9424-85, 9428-85, and 9429-85.Decisions will be entered under Rule 155 in docket Nos. 1584-83, 4971-83, 4973-83, 4974-83, 4975-83, 3135-84, 7823-84, 7824-84, 7825-84, 2480-85, 9422-85, 9423-85, 9425-85, 9426-85, and 9427-85.Footnotes1. Cases of the following petitioners are consolidated herewith: Robert P. Hilt, docket Nos. 4971-83, 7823-84, 9426-85, 9429-85; Trucks, Inc., docket Nos. 4972-83, 7826-84, 9425-85; Robert W. Norris and Sandra M. Norris, docket Nos. 4973-83, 7824-84, 9422-85, 9428-85; Thomas L. Hilt and Katharina Hilt, docket No. 4974-83; LeRoy and Molly Hilt, docket No. 4975-83; RTS Investment Corporation, docket Nos. 3135-84, 2480-85, 9427-85; Thomas L. Hilt, docket No. 7825-84; Thomas L. Hilt and Norma J. Hilt, docket No. 9423-85; and Trucks, Inc.; RTS Investment Corporation, Transferee and Successor to Trucks Inc., docket No. 9424-85.↩2. Although the parties stipulated that the corporation was owned in equal shares by the children during the years in issue, the corporate tax returns report that from 1977 through 1980, each of the children owned 31-1/3 percent, and in 1981 each owned 33-1/3 percent. The record does not disclose who owned the remaining 6 percent from 1977 through 1980.↩3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩4. Thomas Hilt was not classified in 1979 because his compensation for that year was not challenged by the IRS.↩*. Assuming LeRoy in fact rendered services to the three companies.↩5. See also Weaver Paper Co. v. Commissioner,T.C. Memo. 1980-72↩.6. Compare Diverse Industries, Inc. v. Commissioner,T.C. Memo. 1986-84↩.7. The amounts allowed as reasonable by respondent, and sustained by us, for Thomas Hilt's years in issue reflect an approximate per year increase of $25,000.↩8. See section 1.451-2(a), Income Tax Regs.↩